The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader.  The summaries may not be cited or relied upon as they are not the official language of the division.  Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
March 7, 2019

**2019COA36**

**No. 18CA0118, *People in Interest of S.K.* — Juvenile Court — Dependency and Neglect — Termination of the Parent-Child Legal Relationship — Criteria for Termination; Health and Welfare — Disability — Americans with Disabilities Act — Reasonable Accommodations**

A division of the court of appeals considers how the requirements to make reasonable accommodations found in the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 (2018), and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (2018), relate to termination of parental rights based on a disabled parent's lack of success with a treatment plan, unfitness, and unlikelihood of change.  The division concludes that a juvenile court must consider reasonable accommodations in deciding whether such a parent's treatment plan was appropriate and whether reasonable efforts were made to rehabilitate the parent.

Court of Appeals No. 18CA0118
Gunnison County District Court No. 16JV8
Honorable J. Steven Patrick, Judge

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of S.K., a Child,

and Concerning C.K. and S.R.,

Respondents-Appellants.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE WEBB
Román and Freyre, JJ., concur

Announced March 7, 2019

---

David Baumgarten, County Attorney, Gunnison, Colorado, for Petitioner-Appellee

Robert G. Tweedell, Guardian Ad Litem

Susan C. Baker, Office of Respondent Parents' Counsel, El Prado, New Mexico; James Plumhoff, Guardian Ad Litem, for Respondent-Appellant C.K.

Pamela K. Streng, Office of Respondent Parents' Counsel, Georgetown, Colorado; Barbara Remmenga, Guardian Ad Litem, for Respondent-Appellant S.R.

¶ 1    In this dependency and neglect proceeding, S.R. (mother) and C.K. (father) appeal the juvenile court judgment terminating their parent-child legal relationships with S.K. (the child).  To resolve the parents' arguments on appeal, we must consider the requirements of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213 (2018), and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (2018).  The ADA, and in limited circumstances, section 504 require public entities to make reasonable accommodations for qualified individuals with disabilities.

¶ 2    A division of this court has considered this requirement of the ADA in the context of termination because an appropriate treatment plan could not be devised to address the parent's mental impairment.  *See People in Interest of C.Z.*, 2015 COA 87, ¶ 1.  But this case presents a different question under the ADA, which has not yet been addressed in Colorado — How does the requirement to make reasonable accommodations relate to termination based on a disabled parent's lack of success with a treatment plan, unfitness, and unlikelihood of change?  We conclude that a juvenile court must consider reasonable accommodations in deciding whether

such a parent's treatment plan was appropriate and whether reasonable efforts were made to rehabilitate the parent.

¶ 3    Ultimately, we hold that the juvenile court properly considered reasonable accommodations for the parents' disabilities as part of its conclusions that the parents' treatment plans were appropriate and the Gunnison County Department of Health and Human Services (Department) had made reasonable efforts to rehabilitate them. These conclusions are supported by the record. We also reject the parents' remaining arguments regarding parental fitness, likelihood of change, and a less drastic alternative to termination. Therefore, we affirm the termination judgment.

## I. The Dependency and Neglect Case

¶ 4    In June 2016, the Department began receiving reports that the child, then less than three months old, was not gaining weight and the parents were not feeding her often enough. Later that month, the child was admitted to a local hospital for failure to thrive. The next day, the child was transferred to Children's Hospital because she had lost more weight even while being fed every two hours by hospital staff.

¶ 5     The medical team at Children's Hospital believed that the child's failure to thrive was a combination of organic and inorganic reasons. During the child's stay, the medical team observed that the parents

- continued to feed the child only two to three times a day;

- did not spend the night with the child;

- missed the child's occupational therapy appointment;

- placed unsafe items in the child's crib; and

- seemed to have difficulty retaining information regarding the child's care.

Based on these concerns, the Department initiated a dependency and neglect case and took custody of the child.

¶ 6     The parents both stipulated that the child was dependent and neglected because she was without proper care through no fault of their own. In August 2016, the juvenile court adopted treatment plans that required each parent to (1) consistently attend visits with the child; (2) meet with an in-home parenting support provider and learn skills to safely care for the child; (3) sign releases of information; (4) meet the child's needs and provide her with an appropriate living environment; and (5) complete recommended

assessments, including neuropsychological and capacity to parent evaluations, to determine appropriate services.

¶ 7 The parents completed the capacity to parent and neuropsychological evaluations in the fall of 2016. An administrative review division, an outside entity that reviewed the Department's work, advised the caseworker to rewrite the treatment plans to include recommendations from the evaluations.

¶ 8 In late May 2017, the Department moved to amend the treatment plans to include more specific language regarding the plans' requirements. The proposed amendments included requirements for the parents to continue working with a parenting coach; comply with recommendations from the capacity to parent evaluator, including mental health treatment; and follow the recommendations of the neuropsychological evaluator, including therapy and inpatient substance abuse treatment for father and dialectical behavior therapy for mother. The Department also asked the court to appoint a guardian ad litem (GAL) for mother and father based on their mental illnesses or developmental disabilities.

¶ 9 A few weeks later, the juvenile court appointed a GAL for each parent and held an evidentiary hearing on the Department's

proposal to amend the treatment plans. At the hearing, the parents argued that they were not opposed to having more specifics in the treatment plans, but that because the deadline to have permanency for the child was close and the Department had indicated it would be pursuing termination shortly, it was too late to amend the plans.

¶ 10 The child's GAL also took the position that if the court was going to adopt the amended treatment plans, it would need to extend the permanency deadline. The Department responded that if amending the plans would require an extension of the permanency deadline, it would withdraw the request. In the end, the juvenile court denied the Department's motion to amend the treatment plans and continued the existing plans in place.

¶ 11 The next month, the Department moved to terminate the legal relationships between the child and the parents. Before the start of the termination hearing, mother and father filed a joint motion asking the court to find that the Department had not made reasonable efforts to reunify them with the child, dismiss the termination motion, and amend the treatment plans to provide reasonable accommodations under the ADA. After a four-day

hearing, the court rejected the parents' arguments, and in January 2018, terminated their parental rights.

## II. Termination of Parental Rights and the ADA

¶ 12    Mother and father challenge the appropriateness of their treatment plans, the efforts that the Department made to reunify them with the child, and the extent of reasonable accommodations required under the ADA.  Mother contends the juvenile court erred in concluding that her treatment plan was appropriate and the Department had made reasonable efforts to rehabilitate her in light of the ADA and section 504 of the Rehabilitation Act.  Father contends the juvenile court erred in granting termination because the Department failed to make reasonable efforts to provide him with an appropriate treatment plan and reasonable accommodations under the ADA in creating and implementing his treatment plan.  We reject these contentions.

### A. Termination Criteria

¶ 13    As pertinent here, the juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the

plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2018; *People in Interest of C.H.*, 166 P.3d 288, 289 (Colo. App. 2007).

¶ 14    The purpose of a treatment plan is to preserve the parent-child legal relationship by assisting the parent in overcoming the problems that required intervention into the family. *People in Interest of K.B.*, 2016 COA 21, ¶ 11. Thus, an appropriate treatment plan is one that is approved by the court and is reasonably calculated to render the parent fit to provide adequate parenting to the child within a reasonable time and that relates to the child's needs. § 19-1-103(10), C.R.S. 2018; *People in Interest of M.M.*, 726 P.2d 1108, 1123 (Colo. 1986).

¶ 15    In determining parental unfitness and the likelihood that a parent's conduct or condition will change, the court must consider whether reasonable efforts have been unable to rehabilitate the parent. § 19-3-604(2)(h); *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). "Reasonable efforts" means the "exercise of diligence and care" for a child who is in out-of-home placement. § 19-1-103(89).

¶ 16    The reasonable efforts standard is satisfied when services are provided in accordance with section 19-3-208, C.R.S. 2018. § 19-1-103(89).  Among other things, the Department must offer screening, assessments, and individual case plans; information and referrals to available public and private assistance resources; and visitation services.  § 19-3-208(2)(b)(I), (III)-(IV).  If funding is available, it must also provide mental health and substance abuse treatment services.  § 19-3-208(2)(d)(IV)-(V).

## B.  The ADA and Section 504

¶ 17    Title II of the ADA, 42 U.S.C. §§ 12131-12134 (2018), prohibits a public entity from discriminating against a qualified individual with disabilities in the provision or operation of public services, programs, or activities.  *Tennessee v. Lane*, 541 U.S. 509, 517 (2004).  Section 504 of the Rehabilitation Act applies the same requirement to entities that receive federal financial assistance.[1] *See In re H.C.*, 187 A.3d 1254, 1265 (D.C. 2018).  It provides that a qualified person with a disability shall not, "solely by reason of her or his disability, be excluded from the participation in, be denied

---

[1]  Although the juvenile court did not make a finding that the Department was a recipient, it has not argued otherwise on appeal.

8

the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

¶ 18    The ADA was enacted not only to remedy discrimination in the form of intentional exclusion, but also to mandate reasonable modifications to existing policies and to otherwise reasonably accommodate individuals with disabilities.  42 U.S.C. § 12101(a)(5) (2018); *C.Z.*, ¶ 12.  Consequently, it imposes an affirmative duty on a public entity to make reasonable accommodations for qualified individuals with disabilities.  28 C.F.R. § 35.130(b)(7) (2018); *C.Z.*, ¶ 12.

## C.  Qualified Individual

¶ 19    Under the ADA, a qualified individual with a disability is an

> individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2) (2018).

¶ 20 A disability includes a mental impairment that substantially limits one or more major life activities of the individual. 42 U.S.C. § 12102(1)(A) (2018). A mental impairment, in turn, includes any mental or psychological disorder such as "intellectual disability, organic brain syndrome, emotional or mental illness, and a specific learning disability." 28 C.F.R. § 35.108(b)(1)(ii) (2018).

¶ 21 Whether a parent is a qualified individual with a disability under the ADA requires a case-by-case determination.[2] *See Colo. State Bd. of Dental Exam'rs v. Major*, 996 P.2d 246, 249 (Colo. App. 1999). While the Department must provide appropriate screening and assessments of a parent, the parent is responsible for disclosing to the Department and the juvenile court information regarding his or her mental impairment or other disability. And the parent should also identify any modifications that he or she believes are necessary to accommodate the disability.

¶ 22 The Department can accommodate, and the juvenile court can address, only disabilities that are known to them. *See In re Hicks/Brown*, 893 N.W.2d 637, 640 (Mich. 2017). In other words,

---

[2] If disability status is disputed, the juvenile court should make a finding.

10

before a public entity can be required under the ADA to provide reasonable accommodations, the entity must know that the individual is disabled, either because that disability is obvious or more likely because that individual, or someone else, has informed the entity of the disability. *Id.* (citing *Robertson v. Las Animas Cty. Sheriff's Dep't,* 500 F.3d 1185, 1196 (10th Cir. 2007)).

¶ 23    In this case, as the juvenile court recognized in its termination order, and the Department did not dispute, each parent has serious intellectual or developmental disabilities. Mother's neuropsychological evaluation showed that she had a low average intelligence quotient (IQ) and a neurodevelopmental or neurocognitive disorder characterized by difficulties with complex attention and language. She also had an unspecified personality disorder with borderline traits. The neuropsychological evaluator diagnosed father with borderline intellectual functioning based on his IQ and possible symptoms of a premorbid anxiety disorder.

¶ 24    The juvenile court concluded that the parents' low IQs and developmental disabilities severely limited their ability to provide appropriate care for the child. And it had previously appointed a GAL for mother and father based on each parent's mental illness or

developmental disability. Under these circumstances, the parents'
mental impairments were disabilities under the ADA. *See C.Z.*, ¶ 14
(concluding that borderline intellectual functioning and mental
illness diagnoses that impeded the parents' ability to parent the
child were disabilities under the ADA).

### D. ADA's Application to Treatment Plans and Reasonable Efforts

¶ 25    As past divisions of this court have recognized, the ADA does
not restrict a juvenile court's authority to terminate parental rights
when the parent, even after reasonable accommodation of a
disability, is unable to meet his or her child's needs. *Id.* at ¶ 17;
*see also People in Interest of T.B.*, 12 P.3d 1221, 1223 (Colo. App.
2000). But, while Title II of the ADA is not a defense to termination
of parental rights, it applies to the provision of assessments,
treatment, and other services that the Department makes available
to parents through a dependency and neglect proceeding before
termination. *C.Z.*, ¶¶ 19, 22.

¶ 26    Courts in other jurisdictions have also determined that the
requirement to make reasonable accommodations for a parent's
disability affects the scope of rehabilitative services offered to the
parent.

¶ 27    For example, the Alaska Supreme Court has recognized that family reunification services should be provided in a manner that takes a parent's disability into account. *Lucy J. v. State, Dep't of Health & Soc. Servs.*, 244 P.3d 1099, 1115 (Alaska 2010). And it concluded that reunification services are contemplated within Title II of the ADA. *Id.* at 1116. Thus, it reasoned, whether reunification services reasonably accommodated a parent's disability is included in the question whether reasonable efforts were made to reunite the family. *Id.*

¶ 28    Similarly, the Massachusetts Supreme Judicial Court determined that the ADA requires a department to accommodate the parent's special needs in providing services before a termination proceeding. *In re Adoption of Gregory*, 747 N.E.2d 120, 125-26 (Mass. 2001). And the Michigan Court of Appeals held that reunification services must comply with the ADA. *In re Terry*, 610 N.W.2d 563, 570 (Mich. Ct. App. 2000).

¶ 29    The District of Columbia Court of Appeals also expressed its agreement with the numerous other courts that have held or assumed that the ADA's requirement for public agencies to make reasonable accommodations applies to reunification services

provided by states to parents whose children have been removed in neglect proceedings. *H.C.*, 187 A.3d at 1265. It explained that the requirement of reasonable accommodations was entirely consistent with, and perhaps subsumed within, an agency's general statutory obligation to expend reasonable efforts to make reunification possible. *Id.*

¶ 30    The United States Departments of Health and Human Services and Justice have also provided guidance on this subject. *See* U.S. Dep't of Health & Human Servs. & U.S. Dep't of Justice, Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act (Aug. 2015), https://perma.cc/AHU2-P29Y (Technical Assistance Document). They explain that individuals with disabilities must be provided opportunities to benefit from or participate in child welfare programs, services, and activities that are equal to those extended to individuals without disabilities. *Id.* And, to achieve that goal, agencies must make reasonable changes in their practices and services to accommodate the individual needs of a disabled parent.

14

*Id.* The requirement to make reasonable accommodations extends to programs and activities of private and nonprofit agencies that provide services to children and families on behalf of a child welfare agency. *Id.*[3]

¶ 31    Consistent with these federal guidelines, section 19-3-100.5(5), C.R.S. 2018, provides, in turn, that reasonable efforts are satisfied when a Department offers services in accordance with section 19-3-208 and "when full consideration has been given to the provisions of section 24-34-805(2)." And section 19-3-208(2)(g) requires that services provided under that section comply with the ADA and its implementing regulations.

¶ 32    Finally, section 19-3-507(1)(c), C.R.S. 2018, which governs dispositional hearings, provides that

> [i]f one or both of the parents have a disability, reasonable accommodations and modifications, as set forth in the federal

---

[3] In April 2018 — about three months after the court issued the termination judgment in this case — the General Assembly enacted legislation concerning family preservation safeguards for parents with disabilities. The legislation created section 24-34-805, C.R.S. 2018. *See* Ch. 164, sec. 1, § 24-34-805, 2018 Colo. Sess. Laws 1131. Section 24-34-805(2)(a)(III) states that a parent's disability alone must not serve as a basis for denial or restriction of parenting time or parental responsibilities in a dependency and neglect proceeding except when it impacts the child's health or welfare.

15

"Americans with Disabilities Act of 1990", 42 U.S.C. sec. 12101 et seq., and its related amendments and implementing regulations, are necessary to ensure the treatment plan components are accessible. If applicable, any identified accommodations and modifications must be listed in the report prepared for the dispositional hearing.

¶ 33    In sum, absent reasonable modifications to the treatment plan and rehabilitative services offered to a disabled parent, a department has failed to perform its duty under the ADA to reasonably accommodate a disability and, in turn, its obligation to make reasonable efforts to rehabilitate the parent. *See Hicks/Brown*, 893 N.W.2d at 640. And because of this failure, an unmodified plan or rehabilitative service does not satisfy the criteria for terminating parental rights under section 19-3-604(1)(c). *See S.N-V.*, 300 P.3d at 915; *see also People in Interest of D.G.*, 140 P.3d 299, 304 (Colo. App. 2006) (concluding that the juvenile court erred in finding that the Department had provided appropriate rehabilitative services to a parent and, thus, in terminating parental rights).

¶ 34    For these reasons, when a parent involved in a dependency and neglect proceeding has a disability under the ADA, the

16

Department and the juvenile court must account for and, if possible, make reasonable accommodations for the parent's disability when devising a treatment plan and providing rehabilitative services to the parent. And in deciding whether to terminate parental rights under section 19-3-604(1)(c), a juvenile court should consider whether reasonable accommodations were made for the parent's disability in determining whether the parent's treatment plan was appropriate and reasonable efforts were made to rehabilitate the parent.

¶ 35    What constitutes a reasonable accommodation will be based on an individual assessment. *C.Z.*, ¶ 25.[4] For example, the Technical Assistance Document explains that many parents, with or without disabilities, may require training to develop appropriate parenting skills. When, as here, a parent has a cognitive or other mental disability and needs help acquiring parenting skills, child welfare agencies may need to provide "enhanced or supplemental training, to increase frequency of training opportunities, or to provide such training in familiar environments conducive to

---

[4] The juvenile court should also make a finding whether reasonable accommodation has occurred.

learning" and "incorporate the use of visual modeling or other individualized techniques to ensure equal opportunity to participate in and benefit from the training." Technical Assistance Document 10, 15. Technical Assistance Document 5; *see also H.C.*, 187 A.3d at 1266.

¶ 36 Even so, in considering whether reasonable accommodations can be made for a parent's disability, the juvenile court's paramount concern must remain the child's health and safety. *C.Z.*, ¶ 32. In other words, the ADA does not protect a parent who, even by virtue of his or her disability, poses a safety risk to others. *Id.* Nor does the requirement to make reasonable accommodations lower the standards for parents with disabilities. Technical Assistance Document 5.

¶ 37 Of course, the juvenile court's assessment of what constitutes a reasonable accommodation must take into account the child's best interests and need for permanency. *See State in Interest of K.C.*, 362 P.3d 1248, 1253 (Utah 2015). For example, the requirement to make reasonable accommodations under the ADA does not force the court indefinitely to extend the time that a parent is given to participate in rehabilitative services. *Id.* (recognizing that

the ADA does not afford a parent the right to extend a reunification plan indefinitely).

¶ 38 As well, the duty to make reasonable accommodations does not require a public entity to make modifications that would fundamentally alter the nature of its services, programs, or activities. *C.Z.,* ¶ 25; *see also* 28 C.F.R. § 35.130(b)(7). Rather, the ADA requires only accommodations that are reasonable. *K.C.,* 362 P.3d at 1253; *see also Pruett v. Arizona,* 606 F. Supp. 2d 1065, 1079 (D. Ariz. 2009). A modification is reasonable if it is used ordinarily or in the run of cases and will not cause undue hardship. *See Nat'l Fed'n of the Blind v. Lamone,* 813 F.3d 494, 507 (4th Cir. 2016). Thus, for example, an accommodation may not be reasonable if it would require a prohibitive cost or extraordinary effort on the part of the public entity. *Id.*

¶ 39 In the end, what constitutes a reasonable accommodation will vary from case to case based on the child's health and safety needs, the nature of the parent's disability, and the available resources.

¶ 40 Having reached this conclusion, we must next determine whether the juvenile court properly determined that the Department

had made reasonable accommodations for mother's and father's disabilities.

## E. Standard of Review and Application

¶ 41 Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts. *People in Interest of L.M.*, 2018 COA 57M, ¶ 17 (citing *People in Interest of S.N. v. S.N.*, 2014 CO 64, ¶ 21). The credibility of the witnesses; the sufficiency, probative value, and weight of the evidence; and the inferences and conclusions to be drawn from these evidentiary facts are within the juvenile court's discretion. *People in Interest of A.J.L.*, 243 P.3d 244, 250 (Colo. 2010). Hence, we will not set aside a juvenile court's factual findings when they have support in the record. *Id.* at 249-50. However, when deciding mixed questions of fact and law, we review the legal conclusions de novo. *L.M.*, ¶ 17.

### 1. The Juvenile Court's Conclusions

¶ 42 The juvenile court considered the many services offered to the parents and concluded that the Department had provided services, including parenting instruction, that reasonably accommodated the parents' limitations. It also determined that the parents' treatment

plans were appropriate and that the Department had made reasonable efforts to rehabilitate the parents.

## 2. The Parents' Treatment Plans

¶ 43    Mother first argues that the juvenile court erred in finding that her plan was appropriate because it did not include a requirement that she attend training to learn how to meet the child's heightened medical needs.  The record shows that the child had heightened needs.  In the beginning of the case, the child was diagnosed with a variety of medical conditions, including failure to thrive as an infant, severe protein calorie malnutrition, gastroesophageal reflux, umbilical granuloma (a lesion), anisocoria, tongue tie (which could make feeding and weight gain difficult), passive smoke exposure, and a high-risk social situation.

¶ 44    Although the child's conditions had improved, her pediatrician continued to characterize her as a medically complicated child.  He explained that the child had multiple medical conditions, including abnormal eye movement (nystagmus), a developmental delay, delay in growth, and the possibility of a serious metabolic disorder.

¶ 45    While mother's treatment plan did not specifically require her to attend medical training for the child, it did include a provision

that required her to be able to safely care for the child by working with an in-home parenting support provider.  This provision effectively required mother to participate in a service that would prepare her to care for the child's needs.

¶ 46     Next, mother argues that her treatment plan was inappropriate because it did not require her to engage in couples counseling with father.  Mother correctly notes that several witnesses identified concerns about bickering between the parents during visits.  Both the court-appointed special advocate (CASA) assigned to the case and a separate CASA who intermittently supervised visits described such behavior.  The child's occupational therapist likewise reported that the parents bantered, which she characterized as more explosive than arguing, during her sessions.

¶ 47     True, the parents' expert recommended that they participate in individual and couples therapy geared for adults with learning and mental health needs.  However, this recommendation came about as a result of mother's evaluation that was conducted the same month of the termination hearing.

¶ 48     In contrast, the professionals who evaluated the parents earlier in the case believed that mother should engage in

therapeutic services. And the record does not show that they or the other treatment professionals working with the parents recommended couples counseling. As a result, mother's argument that the treatment plan was inappropriate because it did not include a requirement that she engage in couples counseling with father falls short. *See People in Interest of A.E.*, 749 P.2d 450, 452 (Colo. App. 1987) (recognizing that the appropriateness of a treatment plan's requirements must be assessed in light of the realities extant at the time of its adoption).

¶ 49   Finally, mother asserts that the treatment plan was inappropriate because it did not include accommodations for her intellectual disability and was not amended to include individualized treatment after the Department learned of her diagnoses from the neuropsychological evaluator. However, because mother fails to identify what accommodations or individualized treatment should have been incorporated into the plan, we are unable to consider this assertion.

¶ 50   Father asserts that his treatment plan was inappropriate because it did not account for his disabilities. But, like mother in her final assertion, he does not identify what additional components

or accommodations should have been included in the plan.  As a result, we are also unable to consider father's argument.

¶ 51	For these reasons, we discern no error in the juvenile court's determination that the parents' treatment plans were appropriate.

3.  Reasonable Efforts and the Provision of Rehabilitative Services

¶ 52	We first address mother's and father's assertion that the Department did not make efforts to implement the recommendations contained in their capacity to parent and neuropsychological evaluations.  Then we conclude that the record does not support this assertion.

¶ 53	The therapist who completed the capacity to parent evaluation recommended that mother and father engage in therapeutic services to treat their mental health issues.  Specifically, she believed that mother needed to address her childhood experiences and depression, disordered personality, relationship issues, and poor social skills.  The therapist believed that father's therapy should focus on his childhood experiences, feelings of emotional distress, symptoms of anxiety, and sleep disturbances, as well as other feelings regarding losing control and feeling misunderstood.  The psychologist who completed the neuropsychological evaluations

believed that mother would benefit from dialectical behavior therapy to treat her personality disorder because it would fit within the limits of her neurocognitive deficits.

¶ 54     The record shows that both parents received mental health services. Mother completed a mental health assessment and began seeing a therapist sometime in 2016. The caseworker also tried to coordinate dialectical behavior therapy for mother after receiving the neuropsychological evaluation. However, mother missed the first module that was necessary to start treatment and was unable to participate in the program. Father participated in individual therapy during the case.

¶ 55     In addition to therapeutic services, the psychologist opined that mother's deficits in complex attention and language warranted accommodations. He recommended that her neurocognitive disorder be accommodated by giving her additional time to complete tasks, making sure that she was able to explain a concept in her own words, communicating with her in a written format, and giving repeated instructions.

¶ 56     Many of these accommodations were made during the parenting instruction and coaching provided to the parents. For

example, the child's occupational therapist began working with the parents in May 2017 — first for one hour each week and then two hours each week. During each session, the occupational therapist tried to mimic a home environment and worked on skills such as feeding; play that incorporated motor, perceptual, and cognition skills for the child; and a pre-nap routine. The occupational therapist explained that she assessed whether skills or information needed to be repeated for the parents.

¶ 57     The occupational therapist also tried different methods for helping the parents learn developmental skills for the child, including giving them a "help chart" that broke down each month of a child's development; modeling the task that she wanted them to do or the behavior (such as cruising) that she wanted to see from the child; and giving direct feedback when the parents got something right.

¶ 58     Besides working with the child's occupational therapist, the parents also received between two to four hours of parent coaching each week beginning in March 2017. The parenting coach explained that she tried different styles of teaching, including offering instructions or recommendations as well as role modeling

how to handle the situation. She would also give the parents handouts with information they could take home, read, and return with a sheet that they had filled out based on the information that they read.

¶ 59 Additionally, the CASA assigned to the case testified that while she was not allowed to coach the parents during visits, she would ask follow-up questions to see if they understood the information that was given to them during visits with the child.

¶ 60 The psychologist explained that father, who had an extensive drug history which included daily methamphetamine use for six to seven years, was taking a large dose of prescribed Xanax and had possibly migrated from one substance to another. Thus, he recommended that father participate in an inpatient substance abuse program. The psychologist also recommended that father receive coordination of care between his mental health therapist, a psychiatrist who was prescribing the Xanax, and his primary care physician.

¶ 61 Father resisted these recommendations. The caseworker testified that father refused her efforts to coordinate care between his mental health provider, his psychiatrist, and his primary care

physician. And he would not agree to participate in inpatient treatment. The caseworker further explained that the Center for Mental Health controlled the Department's funding for inpatient treatment and would not provide it unless one of their treatment providers supported the recommendation. Father's psychiatrist was one of the center's treatment providers and did not support the recommendation.

¶ 62 The parents' arguments that the Department offered limited and delayed visitation services and parenting education fare no better. True, the parents were only able to start parenting classes offered through CASA in the month before the termination hearing. Still, supervised visitation services and, later, hands-on parenting instruction were offered throughout the case.

¶ 63 Visitation services began at the Department in July 2016. During these initial visits, the caseworker provided direction — verbal instructions as well as demonstrations — when the parents appeared to have a deficit in their understanding of the child's needs. In early September 2016, visits moved to a CASA office; the next month, visits moved to a different CASA office that was closer to the child's placement. The CASA who supervised visits from

28

October 2016 through February 2017 and then again in July 2017 testified that she provided feedback to the parents during visits. She also knew that the parents had been given a schedule of the child's routine.

¶ 64 The Department initially arranged for the parents to have a one-hour visit twice each week, but later increased the schedule to two four-hour visits each week. The caseworker also arranged for the parents to be present for a surgical procedure for the child that involved a muscle biopsy, EEG, and MRI. Because the procedure occurred in Denver, she gave the parents money for gas and food, rented the parents a hotel room, and supervised them while they spent time with the child both pre- and post-operation.

¶ 65 Recall, the parents received several hours of parent coaching and occupational therapy sessions with the child each week. True, parent coaching was implemented about seven months after the court adopted the treatment plan and the occupational therapy sessions began two months later. Still, the parents had seven and five months, respectively, to engage in these weekly services before the termination hearing.

¶ 66    The record also does not support the parents' assertions that the professionals providing parenting education were unqualified to coach disabled parents and gave them conflicting information.  The child's occupational therapist had experience working with individuals with disabilities — she had done volunteer work with the Board for Developmental Disabilities, worked at a school for children with disabilities, and had previously worked with other parents who had developmental disabilities to teach them the skills for managing their child's care.

¶ 67    Although the occupational therapist had not reviewed the parents' evaluations, the caseworker did tell her about some of the evaluators' recommendations.  Additionally, the occupational therapist explained that it became apparent to her that modeling behaviors and calling out interaction styles to the parents, as well as giving more education about the child's developmental level, would be helpful.  She did both.

¶ 68    The parenting coach conceded that this was the first time she had worked with parents who had intellectual deficits or delays.  However, the caseworker asked the parenting coach to make

accommodations for the parents such as demonstrating how to properly feed the child. And the parenting coach did so.

¶ 69 The caseworker agreed that the occupational therapist and the parenting coach had different approaches to working with the parents. She noted that the occupational therapist used hands-on demonstration, while the parenting coach would step back, observe, and then integrate instruction and demonstration. And, as the juvenile court recognized, these providers may have given mixed messages about whether to use a bottle or sippy cup with the child. Yet, as the court concluded, the record does not show that these providers otherwise gave conflicting instructions to the parents.

¶ 70 Mother further argues that the Department did not make reasonable accommodations because it only sought to amend the treatment plan and implement the recommendations from her neuropsychological evaluation after it had decided to pursue termination. The caseworker admitted that she had discussed an adoptive home for the child in November 2016. She also acknowledged that the Department had decided to pursue termination of parental rights as early as January 2017. However, the caseworker clarified that the Department did not file for

termination for another six months because she found the parenting coach and wanted her opinion. And as the juvenile court concluded, the record did not suggest that the Department had withdrawn services or reduced visits based on its earlier consideration of termination.

¶ 71 Finally, we note that father asserts that the Department failed to provide him with adequate assessments, treatment, and other relevant services to enable him to meet the child's basic needs. Yet, he does not explain why the assessments that the Department provided — the capacity to parent and neuropsychological evaluations — were insufficient or identify other assessments that were needed. And apart from his arguments that have already been addressed, he does not identify other treatment or services that would have accommodated his disability and enabled him to parent the child.

¶ 72 For these reasons, the juvenile court properly concluded that the Department made reasonable efforts to rehabilitate the parents and provided services that reasonably accommodated the parents' disabilities. Thus, we will not disturb its conclusion on appeal.

## III. Parental Fitness and Likelihood of Change

¶ 73 Mother contends the juvenile court erred in finding that she was an unfit parent and her conduct or condition was unlikely to change in a reasonable time. The record shows otherwise.

¶ 74 An unfit parent is one whose conduct or condition renders him or her unable or unwilling to give a child reasonable parental care. *People in Interest of D.P.*, 160 P.3d 351, 353 (Colo. App. 2007). Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006).

¶ 75 In determining whether a parent can become fit within a reasonable time, the court may consider whether the parent made any changes during the dependency and neglect proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *D.P.*, 160 P.3d at 353. A reasonable time is not indefinite and must be determined by considering the child's conditions and needs. *A.J.*, 143 P.3d at 1152.

¶ 76 As mother points out, the occupational therapist agreed that mother had shown improvements in some of the daily routines with

the child.  The parents' expert witness also observed that mother showed significant changes between her evaluation by another expert a year earlier and the expert's parent-child interactional evaluation in October 2017.

¶ 77    Despite this progress, the parents' expert did not believe that the child could safely be reunited with the parents.  The caseworker also agreed that mother had tried during the case, but still believed that mother had not been able to develop a parenting relationship with the child and continued to struggle with empathy for others.  Both the caseworker and the CASA who supervised visits described mother treating the child like she was a doll.  The caseworker elaborated that while mother loved the child, she was unable to keep her safe, nourish her, and provide her with appropriate stimulation.

¶ 78    Similarly, the parenting coach opined that mother could not safely parent the child.  She expressed concern that mother would not be able to keep up with the child's growth and development because it would take too long for mother to learn information and consistently implement it and, by that time, the child's needs would change.

¶ 79     During the pendency of the case, mother received a deferred criminal sentence for child abuse involving bodily injury to another child.  Father had also told the parents' expert that he had concerns about the child returning to his home because mother could be short-tempered and impatient.  The psychologist who evaluated mother expounded that the traits of mother's borderline personality disorder included a tendency to impulsively get very angry and to have unstable and intense interpersonal relationships.

¶ 80     Mother asserts that the record shows that she could become a fit parent in a reasonable time with coaching geared towards individuals with disabilities.  The parents' expert believed that the parents could be successfully reunited with the child if they received additional services.  However, the expert estimated that the treatment would take a minimum of six additional months.

¶ 81     In contrast, the caseworker opined that the child needed a permanent home.  Because the child was under the age of six when the petition was filed, the expedited permanency planning provisions applied and required that she be placed in a permanent home within twelve months of her initial out-of-home placement.  §§ 19-1-102(1.6), 19-1-123, 19-3-703, C.R.S. 2018; *People in*

*Interest of M.T.*, 121 P.3d 309, 313 (Colo. App. 2005). And the psychologist who evaluated mother opined that mother's personality disorder was a longstanding pattern of personality characteristics and dysfunction that were unlikely to change over time.

¶ 82 Given this record, we discern no error in the juvenile court's conclusions that mother was an unfit parent and her conduct or condition was unlikely to change in a reasonable time.

IV. Less Drastic Alternative to Termination

¶ 83 Finally, father contends placing the child with the paternal grandmother was a viable less drastic alternative to termination. Again, the record does not support him.

¶ 84 When considering termination under section 19-3-604(1)(c), the court must also consider and eliminate less drastic alternatives to termination. *M.M.*, 726 P.2d at 1122. This determination is implicit in, and thus intertwined with, the statutory criteria for termination. *Id.* at 1122-23. As a result, the determination is influenced by the parent's fitness to meet his or her child's needs. *People in Interest of A.R.*, 2012 COA 195M, ¶ 38.

¶ 85 But the juvenile court must give primary consideration to the child's physical, mental, and emotional conditions and needs when

considering less drastic alternatives to termination. § 19-3-604(3); *D.P.*, 160 P.3d at 356. Thus, placement with a grandparent is not a viable alternative to termination if the grandparent lacks appreciation of the parent's problems or of the child's conditions or needs. *People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004).

¶ 86 The record shows that an out-of-state home study of the paternal grandmother resulted in her being denied for placement of the child. The grandmother had a medical condition that would not allow her to care for the child without assistance and she wanted either father or both of the parents to help her care for the child. However, father was unable to adequately feed the child, understand her cues, or attend to her needs. And, as previously discussed, mother was also unable to meet the child's needs.

¶ 87 For these reasons, the record supports the juvenile court's determination that there was no less drastic alternative to termination and we will not disturb it on appeal.

## V. Conclusion

¶ 88 The judgment is affirmed.

JUDGE ROMÁN and JUDGE FREYRE concur.

37