24CA1418 Peo in Interest of NRL 02-20-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1418
Weld County District Court No. 22JV153
Honorable W. Troy Hause, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of N.R.L. Jr., a Child,

and Concerning N.R.L.,

Appellant.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE MEIRINK
Dunn and Tow, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 20, 2025

---

Bruce T. Barker, County Attorney, David S. Anderson, Assistant County Attorney, Greeley, Colorado, for Appellee

Sandra K. Owens, Guardian Ad Litem

Lindsey Parlin, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1    N.R.L. (father) appeals the juvenile court's judgment terminating his parent-child legal relationship with N.R.L., Jr. (the child).  We affirm.

## I.    Background

¶ 2    The Weld County Department of Human Services filed a petition in dependency and neglect with regard to mother and father after investigating reports that the child had been born exposed to methamphetamine and the child's mother was using drugs and did not have a stable residence.

¶ 3    In March of 2023, father admitted to the allegations in the petition, and the court adjudicated the child dependent or neglected.  The court then adopted a treatment plan for father, requiring him to (1) cooperate with case professionals; (2) complete a substance use evaluation, comply with any recommendations, and submit to urinalysis testing; (3) participate in family time; (4) comply with his ongoing criminal charges; (5) complete an anger management evaluation and comply with any recommendations; (6) maintain appropriate housing; and (7) provide for the child's basic needs.

¶ 4     Father was in the Larimer County jail from November 2023 until April 2024, when he was sentenced to four years in community corrections for assault with a deadly weapon. While father was incarcerated, the Department filed a motion to terminate father's parental rights, alleging that he had not complied with his treatment plan and remained unfit. The court later granted the motion.

## II.     Termination Criteria and Standard of Review

¶ 5     The juvenile court may terminate a parent's parental rights if it finds by clear and convincing evidence that (1) the child was adjudicated dependent or neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan was unsuccessful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2024; *People in Interest of E.S.*, 2021 COA 79, ¶ 10.

¶ 6     As a general matter, whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts. *See People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. The credibility of witnesses; the sufficiency, probative value,

and weight of the evidence; and the inferences and conclusions to be drawn from the evidentiary facts are for the juvenile court to determine. *People in Interest of S.K.*, 2019 COA 36, ¶ 41. We will not set aside a juvenile court's factual findings if they are supported by the record. *Id.* But we review the juvenile court's legal conclusions de novo. *M.A.W. v. People in Interest of A.L.W.*, 2020 CO 11, ¶ 31.

### III.    Reasonable Efforts

¶ 7     Father first asserts that the Department failed to make reasonable efforts to rehabilitate him and reunify his family. Specifically, he claims that the Department did not provide him with (1) transportation assistance; (2) the referrals necessary for anger management therapy; (3) releases of information for him to execute; and (4) family time sessions while he was incarcerated. We perceive no basis for reversal.

### A.    Applicable Law

¶ 8     Before the juvenile court may terminate parental rights under section 19-3-604(1)(c), the department must make reasonable efforts to rehabilitate the parent and reunite the family. §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, 19-3-604(2)(h), C.R.S. 2024.

"Reasonable efforts" means the "exercise of diligence and care" for a child who is in out-of-home placement. § 19-1-103(114). This standard is satisfied by the provision of services in accordance with section 19-3-208. § 19-1-103(114); *see also People in Interest of C.T.S.*, 140 P.3d 332, 335 (Colo. App. 2006).

¶ 9　　The services must be "appropriate to support the parent's treatment plan." *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). Accordingly, the juvenile court should "consider[] the totality of the circumstances and account[] for all services and resources provided to a parent to ensure the completion of the entire treatment plan," *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.

¶ 10　　The parent is ultimately responsible for using the services to comply with the plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011). And the court may consider a parent's unwillingness to participate in treatment in determining whether the department made reasonable efforts. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12.

## B.    Efforts

¶ 11    The juvenile court found that the Department made reasonable efforts to support father's treatment plan, but that he did not engage in many of the offered services.  The record supports this finding.

¶ 12    The caseworker tried to contact father often, using different phone numbers, addresses, and emails when necessary.  For his part, father "let [her] [k]now when he got new phone numbers."  The caseworker lost contact with father for approximately four months before he was arrested.  Nonetheless, after he was incarcerated, the caseworker visited him and was able to communicate with him regularly.  After father entered community corrections, the caseworker repeatedly attempted to contact father and eventually received his cell phone number, allowing for better communication.  She also communicated with father's community corrections case manager.

¶ 13    Father never completed a substance use evaluation.  The caseworker had "several conversations" with father about treating his active substance use, but father refused to engage.  Similarly, while in community corrections, father's case manager reported

that father "missed evaluations and other things that were necessary to move forward in the [substance abuse] treatment."

¶ 14     Before father's incarceration, the Department arranged supervised family time in Weld County and then moved it to Larimer County in order to be closer to father. Despite these efforts, father participated inconsistently in family time.

¶ 15     Father was not able to comply with the requirements of his ongoing criminal case and was arrested during this case. And because father was in community corrections at the time of the termination hearing, he had not yet provided a stable living situation for the child.

¶ 16     Father claims the Department did not work to overcome his transportation barriers, but the record does not support his assertions. The caseworker testified that, when she became aware of father's lack of transportation, she offered to change the location of his services or provide him with bus passes. Father refused the accommodations. Similarly, father asserts that the Department did not provide anger management services, but the caseworker testified that father reported already participating in anger

management services. However, father did not provide a signed release of information allowing the Department's confirmation.

¶ 17    We are also unpersuaded by father's claim that he was not provided with reasonable efforts while incarcerated. Despite the caseworker's several requests, father did not provide her with signed releases of information necessary for the caseworker to confirm that father was participating in services through the jail.

¶ 18    We acknowledge gaps in the provision of family time services for father after his incarceration. For instance, in the first four months father was jailed, family time was not provided. The caseworker testified that providing family time in jail necessitated communication between Weld County and Larimer County, which was "difficult." It was also challenging to get reimbursement approved for supervision of those visits. Nevertheless, in the last month of father's incarceration, "two or three" virtual supervised visits occurred. Similarly, father had been released from jail into community corrections for over a month by the termination hearing, and visits had not yet started there. The caseworker testified that the referral process "take[s] a significant amount of time" and that she had trouble scheduling times for professionals, such as family

time supervisors, to visit father in community corrections. However, looking to the totality of circumstances, *see My.K.M.*, ¶ 33, the record shows that the caseworker persevered in overcoming interjurisdictional challenges to establish family time for father in visits at community corrections, which were scheduled to occur "very soon."

¶ 19 Overall, the record supports, and we conclude, that the Department made reasonable — even if imperfect — efforts to support father's treatment plan objectives.

## IV. Less Drastic Alternative

¶ 20 Father also asserts that the juvenile court erred when it found no available less drastic alternative to termination. We disagree.

¶ 21 The juvenile court must consider and eliminate less drastic alternatives before it terminates the parent-child legal relationship. *People in Interest of L.M.*, 2018 COA 57M, ¶ 24. When considering less drastic alternatives, the court bases its decision on the best interests of the child, giving primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3). The court may also consider whether the child is bonded to

the parent. *People in Interest of D.P.*, 181 P.3d 403, 408-09 (Colo. App. 2008).

¶ 22　For a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs; rather, the less drastic alternative must be the "best" option for the child. *A.M.*, ¶ 27. Therefore, if the court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32. Under those circumstances, we must affirm the court's decision if its findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

¶ 23　Father argues that the caseworker did not investigate several named relatives. The Department is not obligated to investigate all relatives, only a "reasonable number." *People in Interest of M.T.*, 121 P.3d 309, 314 (Colo. App. 2004). The Department did this. The caseworker attempted to seek out other relative placements as part of her diligent search. These relatives included "several family members that . . . [she found] through different databases and networks." None of them was willing to be a placement for the

child.  The caregivers "would only accept termination and adoption" for the child.

¶ 24     The caseworker also opined that the child had no bond with father.  By contrast, the child was attached and bonded to his caregivers and "looks to them for safety."  The caseworker opined that adoption by the caregivers was in the child's best interest.

¶ 25     The court concluded that there were no less drastic alternatives to termination.  In doing so, it explicitly gave primary consideration to the child's physical, mental, and emotions and conditions and needs.  It also based its determination on the evidence showing that the child had no bond with father but shared a strong bond with his adoptive placement.  Because the record supports the court's finding, we will not disturb it.  *B.H.*, ¶ 80.

## V.     Disposition

¶ 26     The judgment is affirmed.

JUDGE DUNN and JUDGE TOW concur.