24CA1726 Peo in Interest of JS 05-08-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1726
Adams County District Court No. 22JV33
Honorable Caryn A. Datz, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of J.S., a Child,

and Concerning K.B.,

Appellant.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE MOULTRIE
Lipinsky and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 8, 2025

---

Heidi Miller, County Attorney, Lisa Vigil, Assistant County Attorney, Westminster, Colorado, for Appellee

Laura Dunbar, Guardian Ad Litem

Beth Padilla, Office of Respondent Parents' Counsel, Durango, Colorado, for Appellant

¶ 1    In this dependency and neglect action, K.B. (mother) appeals the judgment terminating her parent-child legal relationship with J.S. (the child).  We affirm.

## I.    Background

¶ 2    The Adams County Human Services Department received a series of referrals about the then-one-year-old child based on concerns about mother's aggressiveness and domestic violence against her partner.  The Department opened a voluntary case and provided services to mother to keep the child in mother's home. The Department filed a petition in dependency or neglect after mother only minimally engaged in the voluntary services.

¶ 3    The juvenile court adjudicated the child dependent and neglected and adopted a treatment plan for mother.  The child remained at home with mother for more than a year.  But the juvenile court then granted temporary custody of the child to the Department after a major domestic violence incident occurred between mother and her partner in the child's presence.

¶ 4    The Department later moved to terminate mother's parental rights.  Two and a half years after the petition was filed and nearly two years after the juvenile court adopted the treatment plan, the

court terminated mother's parental rights, following a four-day contested hearing.

## II. Fit within a Reasonable Time

¶ 5 Mother first contends that she substantially complied with her treatment plan and needed more time to come into full compliance. Construing her argument as a claim that the juvenile court erred by finding that she could not become fit within a reasonable time, we discern no basis for reversal.

### A. Standard of Review and Applicable Law

¶ 6 Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. "We review the juvenile court's findings of evidentiary fact — the raw, historical data underlying the controversy — for clear error and accept them if they have record support." *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. But we review de novo the juvenile court's legal conclusions based on those facts. *See id.* It is for the juvenile court, as the trier of fact, to determine the sufficiency, probative effect, and weight of

the evidence and to assess witness credibility.  *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

¶ 7  To terminate the parent-child legal relationship, clear and convincing evidence must establish, among other things, that the parent is unfit and that the conduct or condition rendering the parent unfit is unlikely to change within a reasonable time.  § 19-3-604(1)(c)(II)-(III), C.R.S. 2024.

¶ 8  An unfit parent is one whose conduct or condition renders them "unable or unwilling to give the child reasonable parental care to include, at a minimum, nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and conditions."  § 19-3-604(2).  A parent need not comply absolutely with every provision of a treatment plan, but partial or even substantial compliance may not result in a successful plan that renders a parent fit.  *People in Interest of D.L.C.*, 70 P.3d 584, 588 (Colo. App. 2003).

¶ 9  "In determining whether a parent's conduct or condition is likely to change within a reasonable time, the court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the

parent's conduct or condition." *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 24.

¶ 10    What constitutes a reasonable time is fact specific and must be determined by considering the particular physical, mental, and emotional conditions and needs of the child. *Id.* at ¶ 25. A "reasonable time" is not an indefinite time. *Id.* And even when a parent has made progress on a treatment plan, the court is not required to give the parent additional time to comply. *See id.* at ¶¶ 24-25. In addition, when, as here, the child is under six years old at the time of the filing of the petition, the action is subject to the expedited permanency planning provisions and the court must place the child in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, C.R.S. 2024.

## B.    Analysis

¶ 11    Mother's treatment plan required her to address her mental health and trauma history, meet the child's needs, and address domestic violence concerns.[1]

¶ 12    The juvenile court found that mother made some progress in meeting her treatment plan goals.  In particular, the court commended mother for improving her communication skills, improving her ability to manage her emotions, maintaining employment for more than a year, obtaining a driver's license and vehicle, completing probation, demonstrating sobriety, and ensuring that her own basic needs were being met.

### 1.    Mother's Mental Health

¶ 13    The juvenile court found that mother was in partial compliance with her mental health goal.  The court found, with record support, that mother improved her engagement and coping skills in therapy.  But the court found that, despite mother's

---

[1] Although the court amended mother's treatment plan to include a requirement that she complete an assessment with the Department's internal treatment team and follow recommendations, the court found that this amendment was rendered moot by the parties' later agreement to remove it from the treatment plan.

participation in multiple services, she continued to demonstrate emotional dysregulation that negatively impacted the child.

¶ 14 The record supports this finding. Mother's individual therapist testified that mother had been attending services for a year and a half. In that time, mother's overall treatment goals remained the same. The therapist opined that mother's inconsistent attendance and lack of follow through on assignments between sessions negatively impacted her progress in treatment. The therapist expressed concern about mother's inability to emotionally regulate herself or manage her anger, especially in front of the child. Mother's therapist opined that, before mother would be able to safely parent the child, she would need to more consistently attend therapy, complete homework assignments, learn skills to handle the child's emotional dysregulation, complete tasks and use her skills with less or no prompting from a professional, reduce her own emotional dysregulation, understand the child's neglect and trauma, and acknowledge her responsibility for that neglect and trauma. The therapist opined that mother needed "a significant amount of time" in individual therapy to address these concerns, and that mother was just "at the beginning stages" of

accepting responsibility for the neglect and trauma the child experienced in her care.

¶ 15    The family time coach testified that she talked with mother "all the time about regulating" but continued to have concerns about mother's emotional dysregulation during family time.  The coach frequently talked with mother about the importance of not displaying anger in front of the child and not being distracted by things happening outside of family time.  The coach talked with mother about the negative impact her dysregulation had on her engagement with the child.  Despite this sustained coaching, the parenting time coach described instances when mother came to family time "crying and yelling," or became dysregulated during family time when the child did not want to receive physical affection or do what mother wanted.  The family time coach testified that it sometimes took mother "a significant amount of time to calm down" during family time.  The family time coach testified that she had never seen mother use any coping skill other than leaving the room. The coach called the caseworker to help deescalate mother several times.

¶ 16     The coach testified that, when mother was upset, it was "very noticeable," and the child became anxious, as well. When mother was dysregulated during family time, she was unable to read the child's cues or respond to him appropriately. As a result of mother's dysregulation, the child became dysregulated as well, yelling "no," moving quickly from one activity to another, or pushing mother away.

## 2.     Meeting the Child's Needs

¶ 17     The juvenile court found, with record support, that the child had "significant special needs that require great care and attention." Several witnesses testified that the child demonstrated significant developmental delays while in mother's care. When the case opened, the child was more than a year old and was not babbling or verbalizing, demonstrated a flat affect, and was not able to sit up, crawl, or move around. At the time of the termination hearing, the child was three-and-a-half years old. He was diagnosed with a trauma disorder and a global developmental delay. He was receiving occupational therapy, physical therapy, speech language therapy, and play therapy for social-emotional concerns. The child

also received special education services due to a developmental delay disability.

¶ 18 The juvenile court found that, although mother made "substantial progress" in meeting her own needs, she had not successfully completed this objective of her treatment plan because of "her inability to incorporate the parenting coaching and therapeutic skills into safe and protective parenting to meet [the child]'s physical and emotional needs." The court found that "after significant therapeutic intervention [mother] cannot adequately read [the child]'s cues and provide for his emotional and psychological needs."

¶ 19 In so finding, the juvenile court found that mother did not follow through with referrals from the child's pediatrician for early childhood intervention or from the Department for an in-home nursing program, which would have helped her learn about and support the child's complex needs. The court found that mother failed to engage appropriately in the child's in-home therapies when he was in her care, which resulted in the child's discharge from occupational therapy, physical therapy, and speech-language therapy services. The court found that mother was unable to read

the child's cues, "lacked connectivity" with the child, and had yet to integrate any of the child's therapeutic needs into her family time with him.

¶ 20    The record supports these findings. Mother testified that before the Department was involved, the child's pediatrician expressed concerns about the child's delayed development and made two referrals for developmental evaluations with which mother did not follow through. Mother testified that, after the Department's involvement, the child received therapies in her home, but they were discontinued because mother missed and rescheduled appointments. The caseworker testified that the child's providers asked mother to actively participate in sessions at mother's home and to engage in homework tasks with the child, but she failed to do so. The caseworker testified that the child's therapists reached out to her to express concerns about mother's lack of engagement impacting the child's progress in his developmental therapies.

¶ 21    After the child was removed from mother's care, a parenting coach facilitated family time. When the child was re-enrolled in therapies, mother received weekly updates about the child's

10

therapeutic needs.  The parenting time coach worked with mother on the therapists' recommendations and hosted the child's therapists during family time so mother could learn more about the child's therapeutic needs.  Mother and the coach also developed goals for parenting coaching, including reading and responding to the child's cues, putting the child's needs first, creating and implementing a schedule for family time, developing basic parenting skills, and engaging with the child.  The coach testified that mother had not improved in reading and responding to the child's cues, putting the child's needs first during family time, regulating in front of the child, maintaining a schedule for the child during the six-hour visits, implementing strategies from the child's therapies, or improving in her basic parenting skills.

¶ 22    An expert in infant mental health, trauma and attachment (trauma and attachment expert) testified that, based on four observations of mother with the child, she had concerns about mother's ability to meet the child's basic and special needs.  The expert testified that mother was inconsistent in her engagement with the child during family time.  The expert expressed concerns about mother's struggle to be receptive to the child's cues and

inability to tolerate stress or emotionally regulate during family time. The expert described an "indiscriminate attachment" between the child and mother, and opined that it was "hard to tell if [the child] relies on her at all."

### 3. Addressing Domestic Violence

¶ 23 The juvenile court found that mother partially complied with the objective requiring her to address domestic violence concerns. The court acknowledged that mother attended domestic violence offender treatment and completed probation for her criminal domestic violence charges. However, the court found that mother did not successfully integrate the treatment she received and continued to display aggression after she completed treatment.

¶ 24 The record supports these findings. The caseworker testified that mother completed domestic violence treatment and dialectical behavioral therapy and was successfully discharged from probation. However, the caseworker also testified that she had ongoing concerns about mother's violent outbursts in the home after mother completed treatment. One such incident between mother and her boyfriend resulted in the removal of the child from mother's home. Another incident, which the family time coach described in detail

during her testimony, resulted in a restriction of mother's family time away from her home. The trauma and attachment expert opined that the child's night terrors, which started after the incident, were representative of trauma he experienced during that event.

### 4. Mother's Fitness

¶ 25 Given these findings, the court found that, under a totality of the circumstances, mother made "notable and commendable progress in addressing her mental health and housing stability," but that "the overall picture of compliance remains insufficient." The court found that mother had not successfully completed the treatment plan because the same issues addressed in the treatment plan persisted and "significant child protection concerns still exist."

¶ 26 The court found that mother was unfit and was unlikely to become fit within a reasonable time. In so doing, the court considered the lack of change during the case and the length of time mother would need to address her own trauma. The court also considered mother's prior dependency and neglect case, which involved a different child, in which mother failed to address similar concerns; that case ended in the termination of mother's parental

rights.  And, importantly, the court considered the child's special needs, significant trauma, and "troubling responses" to mother around family time.  The juvenile court found that the child's global developmental delay manifested in "unique and challenging therapeutic needs that require vigilant care and constant attention," and that any "further delay would not serve the child's best interests, because a substantial and unreasonable amount of time would be needed for [mother] to become fit."  The court noted that the case had been open for two and a half years and that the treatment plan had been in place for nearly two years.  The court found that "a substantial and unreasonable amount of time would be needed for mother to become fit."

¶ 27    The record supports these findings.

¶ 28    Both the caseworker and the family time coach testified that mother had not made substantial progress in her understanding of the child's needs or her ability to meet them.  The caseworker testified that many services were provided to mother both in and outside of her home, some multiple times, but that mother did not successfully implement what she learned.  The family time coach and the caseworker testified that, despite receiving "intense

14

parenting coaching" after the child's removal, there had not been significant changes in mother's ability to provide basic parenting, read the child's cues, or provide for the child's needs.

¶ 29    Several witnesses testified that mother would need to address her own trauma and emotional regulation before beginning to repair the relationship with the child, but mother testified that she was not working on her own trauma in individual therapy yet and "still [had] work to do" on emotional regulation.  The court found mother's therapist credible in her assessment that "significant time" would be required for mother to fully achieve her individual mental health goals.

¶ 30    The caseworker, an expert in social work with an emphasis in child protection, opined that mother could not address the child protection concerns within a reasonable period of time.  The caseworker acknowledged that a reasonable time could be longer for mother than for some others, but she opined that the two and a half years that mother had been working with the Department was a reasonable time for mother to address the Department's concerns.

¶ 31    Because the record supports the juvenile court's findings, we will not disturb them on appeal.

¶ 32     As part of her argument, mother correctly asserts that expedited permanency guidelines do not have a twelve-month deadline for permanency.  *See* § 19-1-102(1.6).  But mother does not explain, and we cannot discern, how this impacts the court's determination that she could not become fit within a reasonable period of time.  Although the court noted that the matter fell under expedited permanency guidelines to place the child in a permanent home "as expeditiously as possible," the court's findings of fact and conclusions of law are appropriately centered on this child and his unique needs and circumstances.  Nothing in the termination judgment suggests that the time that the child had been in out of home placement was a determining factor in the court's decision to terminate mother's parental rights.

III.    The Americans with Disabilities Act (ADA)

¶ 33     Mother next contends that she was entitled to a "critical accommodation" — "additional time to benefit from the treatment plan."  Mother does not suggest that the services provided by the Department were inappropriate or did not adequately meet her needs.  Rather, mother asserts that she should have been afforded

16

more time to participate in those services as a reasonable accommodation under the ADA.

¶ 34    When a parent has a qualifying disability, the juvenile court and the Department have an affirmative duty to make reasonable accommodations for that parent. *People in Interest of S.K.*, 2019 COA 36, ¶¶ 22, 25, 34; *see* 42 U.S.C. § 12102 (defining "disability" under the ADA); *see also* 42 U.S.C. § 12131(2) (defining "qualified individual" under the ADA); *see also* 28 C.F.R. § 35.130(b)(7) (2024) (directing public entities to make "reasonable modifications" to avoid discrimination on the basis of disability). A parent is responsible for disclosing to the Department and the juvenile court information regarding a disability and any reasonable accommodations that are needed to address the disability. *See S.Z.S.*, ¶ 16. A department can accommodate, and the juvenile court can address, only disabilities that are known to them. *S.K.*, ¶ 22. What constitutes a reasonable accommodation varies from case to case based on the child's health and safety needs, the nature of the parent's disability, and the available resources. *Id.* at ¶ 39.

¶ 35    In this case, the juvenile court ordered, and mother completed, a psychological evaluation. Mother filed the evaluation with a

"Motion for Application of the ADA and Accommodations Associated with her Treatment Plan." Mother asked the juvenile court to "find that accommodations as identified by the evaluator . . . are necessary for mother to access services, and that her treatment plan be amended accordingly." The parties then filed a stipulation, at the court's request, agreeing that "the recommended accommodations are appropriate." The psychological report states that "providers should consider how they are providing [mother] with documents, psychoeducation, and interventions. [Mother] will benefit from taking treatment slowly and at a pace she feels comfortable with."

¶ 36    There is a meaningful distinction between this recommendation, directed at mother's service providers, and mother's appellate assertion that the court should have given her more time to work towards reunification. Mother never requested the accommodation she raises now; the court therefore never determined if additional time to work on her treatment plan was a reasonable accommodation under the ADA. There are, therefore, no findings on this matter for us to review. *People in Interest of T.E.R.*, 2013 COA 73, ¶ 30 (generally, issues not raised in the trial court

will not be considered on appeal); *see also People v. Ujaama*, 2012 COA 36, ¶ 37 (An issue is unpreserved for review when, "among other things, (1) no objection or request was made in the trial court; or (2) an objection or request was made in the trial court, but on grounds different from those raised on appeal.") (citations omitted).

¶ 37 In any event, as detailed above, the court determined that giving mother additional time to become fit would not be reasonable given the child's high needs and mother's lack of progress in addressing the child protection concerns. *See S.K.*, ¶¶ 25, 37 (the ADA does not require the juvenile court to indefinitely extend a parent's opportunity to participate in rehabilitative services; rather, the court may terminate parental rights if a parent is unable to meet her child's needs after reasonable accommodation).

¶ 38 We therefore discern no basis for reversal.

IV.   Disposition

¶ 39 The judgment is affirmed.

JUDGE LIPINSKY and JUDGE JOHNSON concur.