24CA0255 Peo in Interest of OB 09-12-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0255
Arapahoe County District Court No. 22JV75
Honorable Bonnie H. McLean, Judge

The People of the State of Colorado,

Appellee,

In the Interest of O.B., a Child,

and Concerning R.B. and A.L.,

Appellants.

JUDGMENT AFFIRMED

Division A
Opinion by JUDGE RICHMAN
ROMÁN, C.J., and Martinez*, J., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 12, 2024

Ronald Carl, County Attorney, Kiley Schaumleffel, Assistant County Attorney, Aurora, Colorado, for Appellee

Sheena Knight, Guardian Ad Litem

Lindsey Parlin, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant R.B.

Robin Tieman, Office of Respondent Parents' Counsel, Boulder, Colorado, for Appellant A.L.

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     A.L. (mother) and R.B. (father) appeal the judgment terminating their parent-child legal relationships with O.B. (the child).  We affirm.

## I.     Background

¶ 2     The Arapahoe County Department of Human Services (Department) filed a petition in dependency and neglect after concerns arose that mother was abusing substances when she appeared under the influence while picking up the child from the maternal grandmother's house.  The Department also had concerns around father's substance use, domestic violence incidents between the parents, and allegations of sexual abuse involving the child.  The Department placed the child with the maternal grandparents where she remained throughout the case.

¶ 3     Father and mother admitted the allegations in the petition and the juvenile court adjudicated the child dependent and neglected as to each parent.

¶ 4     Each of the parents' separate treatment plans required them to (1) maintain consistent communication and cooperate with the Department and their treatment providers; (2) establish legal, consistent income; (3) obtain and maintain safe housing large

1

enough for the parent and the child; (4) address their substance abuse issues and any mental health concerns; (5) improve parenting skills and participate in consistent family time with the child; and (6) participate in a domestic violence intake and follow through with any recommendations. Father's treatment plan had an additional component that required him to refrain from any further criminal activity.

¶ 5 The Department later moved to terminate the parents' parental rights. Following a hearing in January 2023, the court denied the motion, finding mother was reasonably complying with her treatment plan and could become fit with additional time. The court also denied the motion with regard to father because of concerns about the legality of a criminal protection order that prevented father from having family time with the child and because the court did not believe termination at that time was fair.

¶ 6 Six months later, the Department again moved to terminate the parents' parental rights. Following a two-day evidentiary hearing, the court granted the motion.

## II. Termination Criteria and Standard of Review

¶ 7 The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2024.

¶ 8 Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves the application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. A determination of the proper legal standard to be applied in a case and the application of that standard to the particular facts of the case are questions of law that we review de novo. *M.A.W. v. People in Interest of A.L.W.*, 2020 CO 11, ¶ 31.

¶ 9 However, we will not disturb the court's factual findings and conclusions when they are supported by the record. *Id.* at ¶ 32; *see also A.M.*, ¶ 15. The credibility of the witnesses, as well as the sufficiency, probative value, and weight of the evidence, and the

inferences and conclusions to be drawn from it, are within the court's discretion. *A.M.*, ¶ 15.

### III. Fitness within a Reasonable Time

¶ 10 The parents contend that the juvenile court erred by concluding that their conduct or condition was unlikely to change within a reasonable time. We discern no error. Mother specifically contends that she did not need an indefinite amount of time, but "that she could have become fit in a reasonable period of time — six months." Father contends he had demonstrated recent progress toward his treatment plan objectives.

¶ 11 We address each argument in turn and disagree with both assertions.

### A. Applicable Law

¶ 12 An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give a child reasonable parental care. *People in Interest of S.K.*, 2019 COA 36, ¶ 74. Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental needs and conditions. *Id.*

¶ 13    In determining whether a parent's conduct or condition is likely to change in a reasonable time, the court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *Id.* at ¶ 75. Where a parent has made little to no progress on a treatment plan, the juvenile court need not give the parent additional time to comply. *See People in Interest of A.N-B.*, 2019 COA 46, ¶ 34; *see also People in Interest of V.W.*, 958 P.2d 1132, 1134-35 (Colo. App. 1998) (noting that even "increased compliance" over the course of a case may not justify additional time).

¶ 14    A "reasonable time" is not an indefinite time, and it must be determined by considering the child's physical, mental, and emotional conditions and needs. *A.N-B.*, ¶ 29. What constitutes a reasonable time is fact-specific and varies from case to case. *Id.* at ¶ 40. However, where, as is the case here, the child is under the age of six years old, the court must also consider the expedited permanency planning (EPP) provisions, which require the court to place the child in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, C.R.S. 2024.

## B. Analysis

¶ 15     When the juvenile court denied the motion to terminate after the first termination hearing, the court specifically found that mother needed "to step it up big time, and there's a whole lot more that needs to be done," and that its expectation was that the parents were "engaging 100 percent in their treatment." Following the second termination hearing, the court found it was "concerning . . . that both parents had a second chance to really work on their treatment plan, engage with parenting time, and . . . get custody of [the child] back. And neither one of them did the work that they needed to do."

### 1. Mother

¶ 16     As to mother, the juvenile court also found that it took her an additional six months after the first termination hearing to begin to comply with most of her treatment, and "[t]here's still a lot of issues to be addressed and very little progress has been made." Finally, the court found "that [the] child desperately needs permanency, and given her young age, that additional time is not in [the] child's best interest." We conclude the record supports the court's findings.

¶ 17    At the first termination hearing, mother asked for more time to comply with her treatment plan and show she was a stable parent. The court granted this request.

¶ 18    Yet, at the second termination hearing, the caseworker testified that mother had only just begun to engage with services. The caseworker testified that even when mother did engage, there were concerns that she was not reporting truthfully to providers about her substance abuse and domestic violence experiences.

¶ 19    The caseworker additionally testified she believed mother would need at least another six to twelve months of consistent engagement in treatment. As mother asserts, that is not an indefinite amount of time. But the caseworker also testified that mother had not been able to demonstrate consistent engagement at any point throughout the case. The caseworker further testified that she did not believe additional time was in the child's best interests and that the child had health needs that required consistency the parents had not been able to demonstrate. The juvenile court found the caseworker's testimony to be credible and recited the testimony as part of its findings.

¶ 20    Mother further asserts that although her urinalyses (UA) were positive for marijuana, there was "no evidence presented that she could not parent and use marijuana." This discounts the multitude of missed UAs, which led the juvenile court to note it was difficult to determine mother's sobriety. This also contradicts caseworker testimony from both termination hearings that indicated the child needed a sober caregiver and that the Department was concerned the child would "not be in the care of a sober caretaker at any point" because mother had reported her use was consistent and daily.

¶ 21    The caseworker also testified that mother provided no evidence of stable safe housing or legal, consistent income as required by the treatment plan. The juvenile court expressly found that the parents had failed to demonstrate stable housing and employment.

### 2.    Father

¶ 22    With respect to father, the juvenile court specifically noted there was limited evidence that he had complied with the terms and conditions of his treatment plan. The court additionally described its concerns that father did not engage in treatment after the first motion to terminate was denied, and even after being released from

8

custody, father waited another month before re-engaging in treatment.

¶ 23 Finally, the court found, "[f]ather was not in compliance with his treatment plan during his period of incarceration and that period of incarceration certainly does not inure to his benefit. His . . . poor choices led to his incarceration which negatively affect his ability to safely parent the child as well as work on his treatment plan." We conclude the record supports the court's findings.

¶ 24 Father testified at the second termination hearing that he was complying with the conditions of his probation and abiding by a protection order prohibiting contact between him and mother. But he admitted he was facing probation revocation, and evidence was introduced suggesting that he and mother were living together in violation of the order. Father further asserted he had stable housing and employment, but he provided no evidence of those claims, and the court did not find father's testimony to be credible. *See A.M.*, ¶ 15.

¶ 25 The record also shows that father was never able to provide a clean UA and had only begun engaging in mental health and

domestic violence treatment shortly before the second termination hearing despite being released from custody almost two months prior. The caseworker testified she believed father would need at least another eight to twelve months of consistent and full engagement in treatment services to become a fit parent, which he had never demonstrated an ability to do.

¶ 26 Because the record supports the juvenile court's findings, we will not disturb its legal conclusion.

## IV. Less Drastic Alternative

¶ 27 Father contends that the juvenile court erred by determining there was no less drastic alternative to termination and claims that the Department failed to investigate paternal relatives for placement. We disagree.

### A. Applicable Law

¶ 28 The juvenile court must consider and eliminate less drastic alternatives before terminating parental rights. *People in Interest of M.M.*, 726 P.2d 1108, 1122-23 (Colo. 1986). When making this determination, the court must give primary consideration to the child's physical, mental, and emotional conditions and needs. *See* § 19-3-604(3); *People in Interest of K.B.*, 2016 COA 21, ¶ 35.

¶ 29    In deciding whether long-term or permanent placement with a relative or other person is a viable less drastic alternative to termination, the court may consider various factors including whether a permanent placement prefers adoption rather than an allocation of parental responsibilities (APR). *People in Interest of Z.M.*, 2020 COA 3M, ¶ 31.

¶ 30    For a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs. *A.M.*, ¶ 27. Rather, the proposed alternative must be the "best" option for the child. *Id.* Therefore, if the court considers a less drastic alternative but finds that termination is in the child's best interests, it must reject the proposed alternative and order termination. *Id.* at ¶ 32. Permanent placement is not a viable less drastic alternative if the child needs a stable, permanent home that can only be assured by adoption. *People in Interest of S.N-V.*, 300 P.3d 911, 920 (Colo. App. 2011).

¶ 31    When the juvenile court considers a less drastic alternative and still determines that the termination of parental rights is in the child's best interests, we are bound to affirm that decision if the court's findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## B. Analysis

¶ 32 The juvenile court found that less drastic alternatives had been considered and ruled out, that the child was in a safe and appropriate home, and that an APR was not appropriate. The court further found the child needed "a safe and stable permanent home."

¶ 33 Immediately upon removal, the child was placed with a kinship placement where she remained throughout the case. Father provided a relative affidavit listing, primarily, a paternal aunt and uncle whom the Department did not investigate.

¶ 34 However, the caseworker testified that father's paternal relatives never reached out to inquire about placement, that it was Department policy to not disrupt the child's placement if there were no safety concerns, and that she believed it would not be in the child's best interests to remove the child given her bond with the kinship caregivers.

¶ 35 The record additionally shows both motions to terminate parental rights had the required language pursuant to section 19-3-602(1.5), C.R.S. 2024, advising relatives that they must file a request for guardianship within a timely manner after the motions were filed. § 19-3-602(1.5)(a)(I.5). Yet the record is devoid of any

paternal relatives reaching out to the Department to request guardianship.

¶ 36    Further, the caseworker at the first termination hearing testified she had concerns about father's ability to follow a court order should an APR be entered given father's lack of compliance with court orders in the past.

¶ 37    Father lastly asserts the Department should have reached out to his paternal relatives given the concerns of abuse father and mother reported with regards to the kinship placement.  However, these claims were repeatedly investigated and found not to be credible.

¶ 38    The caseworkers at both termination hearings testified they had no concerns about any abuse occurring at the kinship placement after investigating the reports made by the parents.  Law enforcement additionally responded to numerous reports made by mother concerning the kinship placement, and all investigations were concluded as unfounded.  Testimony instead revealed that the child was happy, well-cared for, and had a strong bond with the kinship placement.

¶ 39    Because the record supports the juvenile court's findings, we will not disturb its legal conclusion.

## V.    Disposition

¶ 40    The judgment is affirmed.

CHIEF JUDGE ROMÁN and JUSTICE MARTINEZ concur.