24CA0476 Peo in Interest of KD 10-17-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0476
Weld County District Court No. 21JV60
Honorable James F. Hartmann, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of K.D., a Child,

and Concerning D.D. and A.G.,

Appellants.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE FREYRE
Grove and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 17, 2024

---

Bruce T. Barker, County Attorney, David S. Anderson, Assistant County Attorney, Greeley, Colorado, for Appellee

Jenna L. Mazzucca, Guardian Ad Litem

Lindsey Parlin, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant D.D.

Just Law Group, LLC, John F. Poor, Denver, Colorado for Appellant A.G.

¶ 1     A.G. (mother) and D.D. (father) each appeal the juvenile court's judgment terminating their parent-child legal relationship with K.D. (the child).  We affirm.

## I.     Background

¶ 2     In January 2021, the Weld County Department of Human Services filed a petition in dependency and neglect after it investigated reports that father had abused the then-six-month-old child, and that the child was dirty, hungry, and bruised.  In October 2021, the court ordered a deferred adjudication of the child and adopted treatment plans for both parents.  It placed the child with L.G. (mother's adoptive parent) from January 2021 until August 2022 and then moved the child to a maternal aunt and uncle's home.  The court also appointed each parent a guardian ad litem (GAL).

¶ 3     Father's treatment plan required him to (1) cooperate with case professionals and maintain contact with the caseworker; (2) complete mental health and substance abuse evaluations and follow any recommendations, including urinalysis testing; (3) engage in all family time; (4) find appropriate housing; and (5) find stable employment or qualify for public benefits.  Mother's

1

treatment plan contained the same requirements and also required her to participate in domestic violence therapy.

¶ 4     Throughout the case, father had a pending felony burglary charge and was involved with pretrial services. As well, mother was convicted of misdemeanor child abuse and criminal mischief.

¶ 5     In October 2022, the court revoked the deferred adjudication and adjudicated the child dependent and neglected with regard to both parents. The Department asserted that neither parent had complied with their treatment plan, that they were unsuccessful, and then filed a motion to terminate their parental rights. In March 2023, while the termination motion was pending, the court amended the parents' treatment plans to include that each complete a neuropsychological evaluation and a parent-child interactional and that they comply with the requirements of their criminal cases.

¶ 6     The termination hearing was set for September and October 2023. Days before the hearing, father filed a motion to continue and a notice of the applicability of the Americans with Disabilities Act (ADA). Father's notice requested accommodations in the form of (1) support and resources to assist with his mild intellectual

disability, (2) incorporating these supports into his treatment and services, and (3) using strategies listed in the neuropsychological evaluation.

¶ 7     The court granted a second continuance and reset the termination hearing for January 2024.  After the hearing, the juvenile court terminated both parents' parental rights.

## II.    Termination Criteria and Standard of Review

¶ 8     A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent or neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2024.

¶ 9     Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.  "We review the juvenile court's findings of evidentiary fact — the raw, historical data underlying the controversy — for clear error and accept them if they

3

have record support." *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. But we review de novo the court's legal conclusions based on those facts. *See id.* In particular, the ultimate determination of whether the Department provided reasonable efforts is a legal conclusion we review de novo. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.

¶ 10 It is for the juvenile court, as the trier of fact, to determine the sufficiency, probative effect, and weight of the evidence and to assess witness credibility. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

### III.    Reasonable Efforts

¶ 11 Mother and father contend that the juvenile court erred by finding that the Department provided them with reasonable efforts. The court explicitly prioritized the health and safety of the child and found that "[t]here has been evidence presented that both parents would qualify [as individuals with a disability] under the . . . ADA. The court concluded that the Department complied with the requirements of the ADA and provided reasonable efforts for both parents. These findings are supported by the record and satisfy the relevant legal requirements.

## A. Applicable Law

¶ 12    Before the juvenile court may terminate parental rights under section 19-3-604(1)(c), the state must make reasonable efforts to rehabilitate the parent and reunite the family.  §§ 19-3-100.5(1), 19-1-103(114), 19-3-208, 19-3-604(2)(h), C.R.S. 2024.  "Reasonable efforts" means the "exercise of diligence and care" for a child who is in out-of-home placement, and the reasonable efforts standard is satisfied when services are provided in accordance with section 19-3-208.  § 19-1-103(114).

¶ 13    When a department knows or should know that a parent has a qualifying disability, it has an affirmative duty to make reasonable accommodations for that parent when providing rehabilitative services.  *People in Interest of S.K.*, 2019 COA 36, ¶¶ 22, 25, 34; *see* 42 U.S.C. § 12102(1) (defining "disability" under the ADA); *see also* 42 U.S.C. § 12131(2) (defining "qualified individual with a disability" under the ADA).  When a parent is found to be a qualified individual with a disability, the juvenile court must consider whether the department made reasonable accommodations for a parent's disability when determining whether it made reasonable efforts.  *S.K.*, ¶ 34.

¶ 14    To benefit from a reasonable accommodation, a parent must raise the issue of the ADA's applicability as early in the proceedings as possible. *See People in Interest of S.Z.S.*, 2022 COA 133, ¶ 16. "The Department can accommodate, and the juvenile court can address, only disabilities that are known to them." *S.K.*, ¶ 22.

¶ 15    The juvenile court should consider whether the provided services were appropriate to support the parent's treatment plan. *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). The parent is ultimately responsible for using those services to obtain the assistance needed to comply with the treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011).

## B.    Efforts for Father

¶ 16    A court-qualified expert in neuropsychology who conducted father's neuropsychological evaluation diagnosed him as having a mild intellectual disability. He opined that father's disability made it challenging for him to "compete tasks [and] to stay engaged" and that he might need tasks to be repeated. He recommended that father receive (1) "ADA accommodations" for this case, (2) individual therapy, (3) a consultation regarding medication management for his mental health symptoms instead of using THC, (4) referrals to a

community-centered board and a vocational rehabilitation center, and (5) a referral to a special advocate to help him stay organized.

¶ 17 The evaluation stated that father "may benefit from" various strategies to compensate for his intellectual disability, including, (1) writing down important information and/or presenting it visually; (2) using alarms, calendars, organizers, external reminders, and mnemonic devises to keep track of important information; (3) creating lists of tasks that need to be completed; and (4) requesting important information in writing.

¶ 18 The court found, with record support, that the Department offered father many of these services, even before the neuropsychological evaluation recommended them.

- When the caseworker, who was experienced with working with families with developmental disabilities, "started having concerns that [father could have an] intellectual disability," during the first year of the case, she referred father for a psychological evaluation. This evaluation could have helped the Department determine what supports father needed to succeed with his treatment plan. And although the evaluator kept the referral open

for "an extraordinar[ily] long time," father never completed it.

- The Department "set up" individual therapy for father but, at the time of termination, the provider had not heard from him during the previous ninety days. The caseworker, whom the court qualified as an expert in child permanency, opined that father was not compliant with this objective of his treatment plan.

- In order to ensure that father "was understanding what the [D]epartment required of him," father's caseworker and his parent advocate with the Office of the Respondent Parent's Counsel (ORPC) asked father to repeat back what they had told him. They also wrote things down for him, and the caseworker followed up with father in text messages and emails.

- The caseworker kept father's GAL and his ORPC parent advocate "in the loop" about her attempts to meet with father. Nevertheless, father missed sixteen months of meetings with her over the course of the case.

- Father's therapeutic visitation supervisor observed that father had "a hard time retaining some conversations and scheduling and following through" so the supervisor worked with him on scheduling and provided consistent reminders. He helped father write down important information regarding scheduling. He — along with father's ORPC parent advocate — helped father use alarms, calendars, and organizers. He maintained eye contact when father spoke, listened to father's questions, and rephrased his feedback when it seemed father was not understanding.

¶ 19    The Department also made additional accommodations after the neuropsychological evaluation was completed. They included those requested in father's notice of the applicability of the ADA.

- The Department referred father to a community-centered board, but father was unwilling to complete the application for this service.

- The caseworker gave father the website to apply for vocational rehabilitation "and told him if he needed assistance, [she'd] be more than willing to help him fill

out those applications or . . . connect him with people to assist him." Father indicated he was "not interested" in that service. Father was unable to find stable employment during this case, and changed jobs four or five times.

- The caseworker referred father for a medication management appointment, but father did not set up the appointment.

- The caseworker continued to help father set up alarms and reminders on his phone and to use a calendar to write down appointments.

¶ 20 The Department also provided services individualized to father beyond those recommended in the neuropsychological evaluation, but father did not comply. The caseworker scheduled her monthly contact with father either at his home or in the community where he wished. The Department provided him therapeutic visitation, offered him transportation and flexible scheduling, and made the visits virtual at his request. Nevertheless, father missed many visits without good cause. And, despite his inconsistent employment, father refused to apply for Supplemental Security Income benefits.

¶ 21 The Department referred father to domestic violence impact therapy throughout the case, but he did not complete it. The Department referred father to a substance abuse evaluation, which he completed after some delay, but he never participated in any recommended treatment. And at the time of the termination hearing, the caseworker was concerned about father's THC use because of the amount he was using.

¶ 22 To the extent father claims that the Department did not make reasonable efforts because it never shared the results of the neuropsychological evaluation with his other providers, the record belies this claim, and to the extent it does not, any error was harmless.

¶ 23 First, although the evaluator testified that he intended for the report to be shared with providers, the written evaluation lists no such requirement. Moreover, father's therapeutic parenting time supervisor testified that he was not provided with the neuropsychological evaluation report, but the caseworker testified that she provided the report to him. Nevertheless, the record shows that the parenting time supervisor made the accommodations it recommended.

¶ 24    Finally, we are not convinced by father's assertion that the parent-child interactional was flawed because the evaluator asked father, against the recommendations of the neuropsychological evaluation, to multitask. The neuropsychological evaluation indicated that multitasking should be avoided *when possible*. And the court-qualified parent-child interactional expert opined that having the child present while interviewing the parent was "standard practice" and "how [she] was trained."

¶ 25    The Department's efforts support the court's findings and amply support the legal requirements for both accommodation under the ADA and reasonable efforts under the Children's Code.

## C.    Efforts for Mother

### 1.    Adult GAL

¶ 26    As an initial matter, mother contends that her need for a GAL to "better engage in her case by facilitating her understanding of the nature and significance of the proceedings," put the Department "on notice" that mother "likely suffered from a significant mental health or cognitive disability." We disagree and find no record support for her claim that the court appointed a GAL because of a significant mental health or cognitive disability.

¶ 27 Under the Children's Code, a GAL may be appointed for a parent in dependency and neglect proceedings "who has been determined to have a behavioral or mental health disorder or an intellectual and developmental disability by a court of competent jurisdiction." § 19-1-111(2)(c), C.R.S. 2024. The juvenile court has discretion to make the appointment. *People in Interest of L.A.C.*, 97 P.3d 363, 366 (Colo. App. 2004).

¶ 28 Here, the court stated that mother's substance abuse evaluation suggested that her "agitation" may prevent her from understanding the proceedings. The court then informed the parties that it would entertain a motion for a GAL for mother. The court granted mother's motion for a GAL eleven days later.

¶ 29 Because the court's determination was based on information in her substance abuse evaluation, we are not convinced that the Department was "on notice" of an intellectual or developmental disability.

### 2.  Preservation of ADA Claim

¶ 30 We agree with the Department and GAL that mother did not preserve her claim that the Department failed to comply with the ADA. The record shows that mother never claimed to be a person

with a disability, and never asked the Department to accommodate her disability or to provide her with accommodations or specialized services under the ADA. Thus, we conclude that mother did not preserve her ADA claim, and we need not address it. *See S.Z.S.*, ¶¶ 15-18 (declining to consider the mother's argument that she was denied reasonable accommodations under the ADA when her counsel argued she had "psychological issues" but did not mention the ADA, did not assert that mother had a qualifying disability, and did not request accommodations for the disability); *see also People in Interest of K.L-P.*, 148 P.3d 402, 403 (Colo. App. 2006) ("[A]rguments never presented to, considered by, or ruled upon by a trial court may not be raised for the first time on appeal.").

### 3. Accommodations Provided

¶ 31 Even assuming mother had preserved her ADA claim, we conclude it would not be successful because the record shows the Department provided her with the services recommended in her neuropsychological evaluation.

¶ 32 Mother's evaluation included the diagnoses of "borderline intellectual functioning," a "mild" math-specific learning disorder, and depression. She also received provisional diagnoses of

paranoid personality disorder and generalized anxiety. The evaluator recommended individual therapy, a domestic violence evaluation, vocational training, and life skills services. Mother's evaluation, like father's, also stated that she "may benefit from" strategies to compensate for her borderline intellectual functioning, including, (1) writing down important information and/or presenting it visually; (2) using alarms, calendars, organizers, external reminders, and mnemonic devices to keep track of important information; (3) creating lists of tasks that need to be completed; and (4) requesting important information in writing. Finally, the evaluation suggested the following practices for those working with mother: good eye contact, active listening, unconditional positive regard, and warm acceptance.

¶ 33 Again, the court found, with record support, that the Department provided mother some of these services even before they were recommended in the neuropsychological evaluation.

- The caseworker ensured that mother's ORPC parent advocate was "present and part of the scheduling for any home visits" to support mother. Despite this, over the

course of the case, mother was not in contact with the caseworker for a period of fifteen months.

- Mother requested assistance with navigating the different appointments in the case, and the caseworker referred mother to a life skills program. The caseworker made this referral three times, but mother never engaged. Life skills services would have "accommodated the recommendation[s] [in her] neuropsychological [evaluation]."

- The caseworker asked mother to repeat things back to her to ensure mother's understanding, wrote down next steps for mother, and followed up with mother after appointments.

- Mother was offered domestic violence therapy through her criminal case, but, at the time of the termination hearing, she had participated in only half of the sessions.

¶ 34 After the neuropsychological evaluation, the Department also provided mother with the following services:

- Individual therapy and group therapy, but mother did not complete them. Mother's substance abuse and

16

mental health evaluator testified that she never reviewed mother's neuropsychological report, but that she conducted a clinical assessment update based on a referral from the Department in March 2023.

- The caseworker worked closely with mother's ORPC parent advocate and GAL, in whom mother "had more trust," in order to accommodate mother's provisional diagnosis of paranoia.

¶ 35   The Department also provided services to mother beyond those recommended in the neuropsychological evaluation, but mother did not comply.

- The caseworker referred mother to Eye Movement Desensitization and Reprocessing psychotherapy, a kind of mental health therapy. Mother did not comply.

- The caseworker testified that mother did not consistently comply with the urinalysis testing her treatment plan required. In the month before the termination hearing, she completed only two of the ten tests requested.

- The caseworker was concerned by "the amount of THC [mother] was using" and mother was referred for a new

substance abuse evaluation. Mother never completed the evaluation.

- The caseworker referred mother to seven visitation agencies; mother was discharged unsuccessfully from six. Mother missed visits every month, even when the visitation was to take place in her own home. Mother was never able to progress from supervised to unsupervised visitation.

- At the time of the termination hearing, the caseworker did not know where mother was residing or if she had obtained financial assistance or employment to provide for the child.

¶ 36 Given these efforts, which satisfy the legal requirements for ADA accommodation and reasonable efforts, we perceive no error in the court's determination that the Department made adequate efforts to rehabilitate mother.

## IV. Less Drastic Alternatives

¶ 37 Both parents assert that the juvenile court erred in determining that there were no viable less drastic alternatives to termination. They claim that the court could have allocated

18

parental responsibilities to paternal grandparents. Mother also argues that an allocation of parental responsibilities (APR) to paternal grandparents would not "threaten the [c]hild's best interests." We perceive no error.

## A.     Relevant Law

¶ 38     The juvenile court must consider and eliminate less drastic alternatives before terminating parental rights. *People in Interest of M.M.*, 726 P.2d 1108, 1122-23 (Colo. 1986). When making this determination, the court must give primary consideration to the child's physical, mental, and emotional conditions and needs. *See* § 19-3-604(3); *People in Interest of K.B.*, 2016 COA 21, ¶ 35.

¶ 39     When deciding whether long-term or permanent placement with a relative or other person is a viable less drastic alternative to termination, the court may consider various factors including whether a permanent placement prefers adoption rather than an APR. *People in Interest of Z.M.*, 2020 COA 3M, ¶ 31.

¶ 40     If the court considers a less drastic alternative but finds that termination is in the child's best interests, it must reject the proposed alternative and order termination. *A.M.*, ¶ 32. Permanent placement isn't a viable less drastic alternative if the child needs a

stable, permanent home that can only be assured by adoption. *S.N-V.*, 300 P.3d at 920.

¶ 41 When the juvenile court considers a less drastic alternative and still determines that terminating parental rights is in the child's best interests, we must affirm that decision if the court's findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## B. Analysis

¶ 42 The court concluded that "there are no less drastic alternatives available . . . short of termination of parental rights." Considering the best interests of the child, the court determined that the termination was the only option because the child needed to "know who his permanent caregivers will be." The record supports this determination.

¶ 43 The caseworker investigated placement with mother's two suggested placements for the child, but both said they would not be able to provide for the child. The caseworker also investigated paternal grandparents at father's request. However, paternal grandparents did not comply with the background checks necessary to become placement providers.

¶ 44    We acknowledge the parents' arguments that there is some indication in the record that an APR might be viable. For example, an expert testified that a "well-structured" APR order can serve a child's best interests. And the parent-child interactional expert opined that both parents had a "positive" but "weak" bond with the child. However, the record shows that the current placement providers were unwilling to accept an APR, and the caseworker opined that an APR would not be in the child's best interests. Ultimately, the court determines the probative value of the evidence. *A.J.L.*, 243 P.3d at 249-50. Here, because the record supports the court's determination that the child's best interests would not be served by an APR, we will not disturb it on appeal.

## V.    Disposition

¶ 45    The judgment is affirmed.

JUDGE GROVE and JUDGE LUM concur.