24CA0242 Peo in Interest of TS 12-26-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0242
Jefferson County District Court No. 21JV493
Honorable Ann Gail Meinster, Judge

The People of the State of Colorado,

Appellee,

In the Interest of T.S., X.J.S., Al. S., and An. S., Children,

and Concerning D.A., S.M.S., and H.S.,

Appellants.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE HARRIS
Yun and Kuhn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 26, 2024

Kimberly Sorrells, County Attorney, Melanie Douglas, Special County Attorney, Golden, Colorado, for Appellee

Jeffrey C. Koy, Jordan Oates, and Lauren Dingboom, Guardians Ad Litem

Robin Tieman, Office of Respondent Parents' Counsel, Boulder, Colorado, for Appellant D.A.

Lindsey Parlin, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant S.M.S.

Patrick R. Henson, Office of Respondent Parents' Counsel, Chelsea A. Carr, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant H.S.

¶ 1    In this dependency and neglect proceeding, S.S. (mother), H.S., and D.A. appeal the juvenile court's judgment terminating their parent-child legal relationships with Al.S., An.S., T.S., and X.J.S. (the children).[1] We affirm.

## I.    Background

¶ 2    In October 2021, the Jefferson County Division of Children, Youth, and Families (Department) received reports of domestic violence between mother and H.S. and of the parents' physical abuse of the children. When caseworkers went to the house to investigate, six-year-old T.S. and almost-four-year-old X.J.S. told the caseworker that H.S. often punched them, and that mother beat them with a belt, a hanger, or "whatever [she] c[ould] find." Those children also recounted incidents of domestic violence between mother and H.S., including the incident that prompted the investigation. According to the children, H.S. pushed mother against the wall and punched her, so mother pepper sprayed him. This altercation occurred near Al.S. and An.S., the three-month-old twins. When questioned, H.S. acknowledged that he regularly

---

[1] H.S. is the father of Al.S., An.S., and T.S.; D.A. is X.J.S.'s father.

punched T.S. and X.J.S. in the arms, thighs, and chest and expressed displeasure that the children "flinch[ed] when he [wa]s around." Mother insisted that she had not hit T.S. and X.J.S. with a belt for a few months. And she denied that she and H.S. had had any physical altercations since 2019, when she hit him with her car. The car incident resulted in mother's conviction for assault and the issuance of a protection order, which mother and H.S. had apparently routinely violated.

¶ 3     Based on the referrals and the investigation, the Department initiated a dependency and neglect proceeding. The parents admitted the allegations in the petition, and the children were adjudicated dependent and neglected. The court then adopted treatment plans for the parents.

¶ 4     In August 2022, the Department moved to terminate parental rights. A seven-day termination hearing was held over a period of three months. In the interim, H.S. pleaded guilty to child abuse charges pertaining to T.S. and X.J.S.

¶ 5     At the conclusion of the termination hearing, the juvenile court denied the motion. It found that while the evidence supported termination of H.S.'s and D.A.'s parental rights, mother

2

had made progress in her treatment plan and might be able to become fit within a reasonable time.

¶ 6     A few months after the termination hearing, the Department obtained hundreds of recorded telephone calls between mother and H.S. that showed mother had lied under oath and deceived the court, the caseworkers, and service providers by continuing a relationship with H.S. and allowing H.S. to have contact with the children in violation of court orders.  In the conversations, which occurred over a fifteen-month period, mother and H.S. joked about their prior domestic violence incidents and endorsed future physical abuse of the children.  They also joked about "fooling the [Department] and other professionals," and, after the termination hearing, they "talk[ed] . . . about how good [they] were at fooling the [c]ourt."  Mother admitted that "[her] plan [wa]s to say whatever [she] need[ed] [to] about [H.S.] to get the children back in [her] care."  The Department again moved to terminate parental rights.

¶ 7     Following a four-day hearing in late October and November 2023, the juvenile court granted the motion.

## II. Termination Criteria and Standard of Review

¶ 8 The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2024.

¶ 9 Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves the application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. A determination of the proper legal standard to be applied in a case and the application of that standard to the particular facts of the case are questions of law that we review de novo. *M.A.W. v. People in Interest of A.L.W.*, 2020 CO 11, ¶ 31.

¶ 10 However, we will not disturb the court's factual findings and conclusions when they are supported by the record. *Id.* at ¶ 32; *see also A.M.*, ¶ 15. The credibility of the witnesses as well as the sufficiency, probative value, and weight of the evidence, and the

inferences and conclusions to be drawn from it are within the court's discretion. *A.M.*, ¶ 15.

### III.    Reasonable Efforts

¶ 11    The parents assert that the juvenile court erred by finding the Department made reasonable efforts to rehabilitate them and reunite them with the children.

### A.    Preservation

¶ 12    The parents and the Department assert this issue was preserved. The guardian ad litem argues H.S. did not preserve this claim for appeal. We need not decide this issue because, even if we assume H.S. preserved his claim, we discern no reversible error.

### B.    Relevant Law

¶ 13    A department of human services must make reasonable efforts to rehabilitate parents and reunite families before a court may terminate parental rights pursuant to section 19-3-604(1)(c). *See* §§ 19-3-100.5(1), 19-3-604(2)(h), C.R.S. 2024. Reasonable efforts means the "exercise of diligence and care" for children who are in out-of-home placement. § 19-1-103(114), C.R.S. 2024. Services provided in accordance with section 19-3-208, C.R.S. 2024, satisfy the reasonable efforts standard. § 19-1-103(114).

¶ 14    Among those services required under section 19-3-208 are screening, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral services to available public and private assistance resources; family time services; and placement services.  § 19-3-208(2)(b).

¶ 15    In deciding whether a department has satisfied its reasonable efforts obligation, the juvenile court should consider whether the provided services were appropriate to support the parent's treatment plan.  *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011).  The parent is ultimately responsible for using those services to obtain the assistance needed to comply with the treatment plan.  *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011).  And the court may consider a parent's unwillingness to participate in treatment when determining whether a department made reasonable efforts.  *See People in Interest of A.V.*, 2012 COA 210, ¶ 12.

¶ 16    Whether a department of human services satisfied its obligation to make reasonable efforts is a mixed question of fact and law.  *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8.  We review the

court's factual findings for clear error but review de novo its legal determination based on those findings as to whether the department satisfied its reasonable efforts obligation. *Id.*

### C. Discussion

#### 1. Mother's Therapy

¶ 17 After the first termination hearing, mother's treatment plan was amended to add two requirements — participation in individual trauma therapy and participation in either parent-child interaction therapy (PCIT) or family therapy. Mother asserts that the Department failed to make reasonable efforts in this regard because the caseworker merely provided her with information about a website and did nothing to assist her in obtaining a therapist.

¶ 18 The juvenile court found the Department made reasonable efforts, that "[e]very possible service was made available," and that it was mother's delays and failure to engage with and internalize those services that caused her treatment plan to fail.

¶ 19 The record shows that the Department repeatedly attempted to provide mother with therapeutic services that she either delayed or failed to engage with. *A.V.,* ¶ 12.

7

¶ 20    With respect to the trauma therapy requirement, mother testified that in June 2023, her primary therapist gave her a list of trauma specialists.  Mother did not immediately contact any of them.  Instead, according to the caseworker, mother reported in August and September that she was receiving trauma therapy at "Mile High," but in November mother admitted that she was not in trauma therapy because Mile High did not provide that service.  At that point, the caseworker sent a link to the website, Psychology Today, and "specifically outlined how to look for a trauma therapist."  The caseworker testified that the website has photographs and biographies of the therapists, and she wanted to give mother an opportunity to "take some time and explore who she might identify with and would be comfortable starting to process her trauma with."  Mother did not contact any of the therapists from the website.  She said she was waiting to hear if she could participate in trauma therapy with the same provider who was scheduled to conduct her mental health evaluation.  In November 2023, after the second termination hearing had started, she asked her primary therapist to re-send the referral list from June.

¶ 21    On appeal, mother faults the Department for not "vet[ting] any of the therapists" from the website or checking to see if they had availability and would be willing to work with mother.  The caseworker testified, however, that she "offer[ed] to assist [mother] in th[e] process" of finding a suitable therapist, but mother did not "take [her] up on that offer."  And the reason mother had not enrolled in individual trauma therapy by the time of the second termination hearing was not because of the caseworker's supposedly inadequate efforts.  Mother testified that she was not engaged in therapy because she had "just a lot of different things [she] was trying to . . . manage," and "it was hard to fit it into [her] schedule," between work and trying to find daycare.

¶ 22    As for the PCIT or family therapy component, there did not seem to be any dispute that the Department coordinated those services as soon as the treatment plan was amended.  The caseworker testified that the Department initiated a referral in April 2023, and the provider agreed to begin services in mid-May. Mother's schedule did not permit family therapy at that time, though, so the services began in June.  In August, at mother's request, the Department initiated a new referral to a second

provider. But the intake process dragged on for a couple of months due to mother's lack of engagement. In the meantime, the court suspended mother's visits with the twins and X.J.S. based on concerns regarding the physical and emotional safety of those children during visits. By the time of the second termination hearing, mother was only engaged in family therapy with one of the older children.

¶ 23    At the termination hearing, mother acknowledged that she had not taken full advantage "of the opportunity . . . to engage in the treatment over the" two years the case was open.

¶ 24    Given all this, we conclude that the court did not err in determining that the Department made reasonable efforts to help mother comply with her treatment plan.

### 2.    D.A.'s Services

¶ 25    D.A. was incarcerated throughout the two years the case was open. He asserts that the Department failed to provide him with, or determine if he was eligible for, any services or referrals in support of his treatment plan.

¶ 26    The juvenile court found that the Department made reasonable efforts and that D.A. was not engaged in any treatment.

¶ 27      The record shows D.A.'s incarceration and failure to communicate with the caseworker prevented him from engaging in services. *Id.* The caseworker testified that the Department was not able to provide services to D.A. where he was incarcerated due to facility rules. The caseworker said that she made repeated efforts to contact D.A. and staff at the facility to see what services may be available but received no information concerning what services D.A. may have already completed or would have been available to him. The caseworker also testified the facility would not allow family time to occur between D.A. and his child, X.J.S.

¶ 28      When the caseworker was able to obtain a face-to-face meeting with D.A., D.A. intimidated the caseworker, and the caseworker did not feel safe during the meeting. Face-to-face contact was discontinued by the Department.

¶ 29      Still, the caseworker testified that she sent letters to D.A. and included stamped envelopes for him to use to contact the Department. The letters went unanswered. D.A. alleged that he never received the letters; however, he was an active participant in hearings throughout the case, and he never reported any difficulty in contacting the caseworker until the second termination hearing.

11

¶ 30    Because the record supports the court's findings, we discern no error in the court's conclusion that the Department made reasonable efforts with respect to D.A.

### 3.    H.S.'s Services

¶ 31    During the pendency of the case, H.S. pleaded guilty to child abuse charges and to drug charges filed in a separate case.  He was sentenced to an aggregate term of ten years in custody.  H.S. asserts that while he was in custody, the Department failed to provide screening assessments, counseling, and information and referrals as well as family time services as required under section 19-3-208(2)(b).

¶ 32    The juvenile court found that the Department made reasonable efforts and that H.S. had "never taken advantage of any treatment that might have been available to him and has not addressed the issues on his part that opened this case."

¶ 33    The record shows that H.S. failed to engage or participate regularly in family time while he was not incarcerated and failed to engage in voluntary services while incarcerated.  *A.V.*, ¶ 12.

¶ 34    At the beginning of the case, when H.S. was not incarcerated, he attended only two family time visits.  The caseworker testified

12

that she maintained regular face-to-face meetings with H.S. while he was incarcerated and would routinely inquire what services were available at his facility. H.S. denied any services were available, but the caseworker testified she confirmed with Creative Treatment Options, which provides services in that facility, that there were voluntary services available. The caseworker also testified that she identified a variety of services H.S. could take advantage of while incarcerated, including substance use treatment, individual therapy, and a fatherhood program. To access those services H.S. needed only to "willingly ask" for them, but he never did so.[2]

¶ 35 In light of this evidence, we cannot say that the court erred by determining that the Department made reasonable efforts to assist H.S. with his treatment plan.

### IV. Fitness Within a Reasonable Time

¶ 36 Mother argues that the juvenile court erred when it found she could not become a fit parent within a reasonable amount of time.

---

[2] At the second termination hearing, H.S. implied that he was precluded from participating in services at the jail, but he did not introduce any evidence to support the implication.

¶ 37    An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give a child reasonable parental care. *People in Interest of S.K.*, 2019 COA 36, ¶ 74. "Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs." *Id.*

¶ 38    In determining whether a parent's conduct or condition is likely to change in a reasonable time, the court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *Id.* at ¶ 75. Where a parent has made little to no progress on a treatment plan, the juvenile court need not give the parent additional time to comply. *See People in Interest of A.N-B.*, 2019 COA 46, ¶ 34; *see also People in Interest of V.W.*, 958 P.2d 1132, 1134-35 (Colo. App. 1998) (noting that even "increased compliance" over the course of a case may not justify additional time).

¶ 39    A "reasonable time" is not an indefinite time, and it must be determined by considering the child's physical, mental, and

14

emotional conditions and needs. *A.N-B.*, ¶ 29. What constitutes a reasonable time is fact-specific and varies from case to case. *Id.* at ¶ 40. However, where, as is the case here, the child is under the age of six years old, the court must also consider the expedited permanency planning (EPP) provisions, which require the court to place the child in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, C.R.S. 2024.

## B. Discussion

¶ 40 The juvenile court found the same issues that caused the Department to open the case had not been sufficiently addressed and there were still significant concerns about mother's ability to parent the children. The court additionally found "[t]here [were] no amendments to the treatment plans that would allow [the parents] to be successful within a reasonable period of time."

¶ 41 True, at the first termination hearing, the court and the Department acknowledged that mother had substantially complied with her treatment plan. But later, the court and professionals learned of mother's substantial deceit and ongoing threats of violence against the children.

15

¶ 42    Specifically, the Department was concerned that H.S. and mother were still in contact despite a protection order preventing contact. The caseworker testified that mother made almost daily phone calls to H.S. while he was incarcerated, and that she had lied to professionals and under oath when she denied being in contact with or in a relationship with H.S. Mother admitted that during the calls, she expressed that she "was going to" use violence against the children. Although mother claimed that she was just "venting," the juvenile court concluded that it had to take mother's statements at face value.

¶ 43    Additionally, mother admitted she allowed two of the children to be in contact with H.S., in violation of a criminal protection order against H.S. which named the children as the victims. She further testified that she was unsure if she would resume a relationship with H.S. in the future and could not say the relationship had ever actually ended.

¶ 44    Even aside from the jail calls, concerns about mother's fitness and the children's safety remained. Mother admitted she had driven an older child not involved in this case to another residence to allow the child to fight with a peer. Mother's family time sessions

16

required extra supervision to ensure the children did not run away or injure themselves. The family time supervisor described the visits as chaotic, rough, and "unsafe." Shortly before the second termination hearing, mother's family time with the three youngest children was discontinued due to concerns of the children's extreme dysregulation before, during, and after visits, as well as mother's failure to show up for and cancellation of family time. The caseworker testified there were concerns that mother and H.S. were encouraging the children to lie to the Department.

¶ 45 Mother's therapist could not put a fixed date on the amount of time mother would need to be able to complete her treatment. Mother herself admitted that the testimony from professionals suggested "that it could take a very long time" for her to address the issues that led to the Department's involvement and that she could not "put a number on" how long it would take. When pressed, she said that an additional six months might be sufficient.

¶ 46 Mother ultimately had two years between the time the petition was filed to the second termination hearing to become fit and comply with her treatment plan, and she failed to do so. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006) ("[P]eriods as

short as five to nine months have been held to be sufficient time to comply with a treatment plan.").

¶ 47    We conclude there is record support for the court's finding that mother could not become fit within a reasonable time.

## V.    Less Drastic Alternatives

¶ 48    D.A. and H.S. assert that the juvenile court erred by finding there were no less drastic alternatives to termination.

### A.    Relevant Law

¶ 49    The juvenile court must consider and eliminate less drastic alternatives before terminating parental rights. *People in Interest of M.M.*, 726 P.2d 1108, 1122-23 (Colo. 1986). When making this determination, the court must give primary consideration to the child's physical, mental, and emotional conditions and needs. *See* § 19-3-604(3); *People in Interest of K.B.*, 2016 COA 21, ¶ 35.

¶ 50    For a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs. *A.M.*, ¶ 27. Rather, the proposed alternative must be the "best" option for the child. *Id.* Therefore, if the court considers a less drastic alternative but finds that termination is in the child's best interests, it must reject the proposed alternative and order termination. *Id.* at ¶ 32. Permanent

placement is not a viable less drastic alternative if the child needs a stable, permanent home that can only be assured by adoption. *S.N-V.*, 300 P.3d at 920.

¶ 51 When the juvenile court considers a less drastic alternative and still determines that the termination of parental rights is in the child's best interests, we are bound to affirm that decision if the court's findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

B. Discussion

¶ 52 H.S. says that the juvenile court misapplied the law when it explained that the less drastic alternatives analysis was separate from the issue of whether a relative was available to care for the children under an allocation of parental responsibilities (APR). We think the juvenile court was exactly right.

¶ 53 Whether a less drastic alternative to termination exists depends on whether the parent-child relationship is beneficial to the child and should remain intact or whether it is in the child's best interests to sever the relationship so that the child can achieve stability and permanence through adoption. *See J.C.R.*, 259 P.3d at 1285; *B.H.*, ¶ 62. Thus, the mere availability of a relative to act as a

19

long-term caretaker does not change the less-drastic-alternatives analysis.

¶ 54 The evidence supports the court's determination that an ongoing relationship with the parents was not in the children's best interests. The younger children — X.J.S. and the twins — would cry and cling to the foster parent to try to avoid visits with mother. The visits, which often required up to four professionals to supervise, became so detrimental to X.J.S. and the twins' emotional well-being that the court stopped the visits a couple of months before the second termination hearing. When X.J.S. attended visits, for example, he would scream uncontrollably or "run out of the room and cower" in a separate part of the facility, saying to himself, "I am a bad boy. I am mean to people." T.S. also internalized the parents' abuse: when he was first removed from his home and placed in foster care, the six-year-old told the caseworker that he needed to be "placed in a home where the family hates me so that they will beat me . . . because that is what I deserve."

¶ 55 At least as early as the summer of 2023, X.J.S. repeatedly told professionals that he was scared to go home and wanted to stay with the foster parent. T.S. likewise told the caseworker that he

wanted to be adopted. According to the family time supervisor, T.S. could not be safely returned home, as he and an older child had vowed to "never report [abuse] again because [the Department's involvement] [wa]s their fault" — a message conveyed to them by mother and H.S.

¶ 56 The caseworker opined that an ongoing relationship with the parents was not in the children's best interests. She testified that mother and H.S. did not "understand the impact of the abuse that the children endured," and, as a result, they could not meet the children's emotional and physical needs. Indeed, the caseworker said that "the parents pose[d] a protective risk to the[] children," and that if the relationship were preserved, "there [was] a concern that the children would be consistently re-triggered" and that a "culture of violence" would persist.

¶ 57 Based on all this evidence, the court found that because the "protective concerns" in the case were so serious, an APR was not appropriate. It found that T.S., X.J.S., and the twins needed the stability, permanency, and safety of an adoptive home. Those findings are not clearly erroneous.

¶ 58    By finding that an APR was not in the children's best interests, the court necessarily determined that it could not allocate parental responsibilities to H.S.'s sister or D.A.'s mother. And because mother could not parent the children and an ongoing relationship was detrimental to the children, an APR to her was not a less drastic alternative.

¶ 59    Even so, the record supports a finding that neither placement was a viable alternative to termination. H.S.'s sister had had previous dependency and neglect referrals involving her own child a few years earlier. There was also evidence that the sister was facilitating communication between mother and H.S. concerning their plan to support placement with a grandmother so that they could later retrieve the children from that placement. As for D.A.'s mother (X.J.S.'s grandmother), the caseworker testified that she contacted the grandmother to inquire about placement and notify her of the interstate compact on the placement of children (ICPC) requirements, but grandmother stopped responding to the caseworker's inquiries. Grandmother eventually resumed communication with the Department, and at the time of the second termination hearing, the ICPC process was pending. Still, the

caseworker had concerns about placing the children with grandmother, as she had never met any of the children; initially, she was not willing to care for the twins; she had never requested visits with the children; and mother and H.S. had discussed supporting placement of the children with grandmother so that once the case was concluded, they could take the children back.

¶ 60    Because we conclude that the record supports the juvenile court's less drastic alternatives findings, we will not disturb them on appeal.  *See B.H.*, ¶ 82.

## VI.    Denial of Motion to Continue

¶ 61    On the final day of the termination hearing, after all parties had rested, H.S.'s counsel asked the court to continue the hearing so that she could present evidence disputing the Department's assertions about H.S.'s sister's criminal history.  The juvenile court denied the request.  On appeal, H.S. says the court's denial constitutes an abuse of discretion.

¶ 62    We will not disturb a court's ruling on a motion to continue unless the ruling is manifestly arbitrary, unfair, or unreasonable, or represents a misapplication of the law.  *People in Interest of E.B.*, 2022 CO 55, ¶ 14.

¶ 63    In ruling on a motion for a continuance, the juvenile court should balance the need for orderly and expeditious administration of justice against the facts underlying the motion while considering the child's needs for permanency. *People in Interest of T.M.S.*, 2019 COA 136, ¶ 44. When, as here, the EPP provisions apply, the juvenile court cannot delay or continue the termination hearing absent good cause and a finding that the delay would serve the child's best interests. §§ 19-3-104, 19-1-123, C.R.S. 2024.

¶ 64    The purpose of the continuance was to provide additional information in support of H.S.'s request that the court order an APR to his sister. But because the court determined that an APR was not in the children's best interests, the denial of the motion to continue was neither an abuse of discretion nor prejudicial to H.S. *See Interest of Spohr*, 2019 COA 171, ¶ 32.

## VII.   Disposition

¶ 65    The judgment is affirmed.

JUDGE YUN and JUDGE KUHN concur.