24CA1114 Peo in Interest of RJM 04-10-2025

COLORADO COURT OF APPEALS

_____

Court of Appeals No. 24CA1114
Moffat County District Court No. 21JV5
Honorable Brittany Schneider, Judge

_____

The People of the State of Colorado,

Appellee,

In the Interest of R.J.M., a Child,

and Concerning R.H.,

Appellant.

_____

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE J. JONES
Brown and Yun, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 10, 2025

_____

Alison D. Casias, Special Assistant County Attorney, Dillon, Colorado, for
Appellee

Debra W. Dodd, Guardian Ad Litem

Beth Padilla, Office of Respondent Parents' Counsel, Durango, Colorado, for
Appellant

¶ 1    In this dependency and neglect proceeding, R.H. (mother) appeals the judgment terminating her parent-child legal relationship with R.J.M. (the child).  We affirm.

## I.    Background

¶ 2    In June 2021, mother was arrested after physically assaulting the child's twelve-year-old-sister and the child's maternal grandmother.  The Moffat County Department of Human Services then filed a petition in dependency and neglect regarding the then-six-year-old child, who was present during the assault.  The Department raised concerns about mother's substance abuse, domestic violence, and involvement in the criminal justice system.  Initially, the Department placed the child with paternal grandmother before returning the child to mother's care.  But the Department later removed the child from mother's care and again placed him with paternal grandmother.

¶ 3    The juvenile court adjudicated the child dependent or neglected and adopted a treatment plan that required mother to attend substance abuse treatment and demonstrate sobriety; refrain from engaging in criminal activity; attend individual therapy;

1

participate in life skills training and parenting classes; complete domestic violence, psychological, and parenting capacity evaluations and comply with any recommended treatment; develop skills to meet the child's needs; and cooperate with the Department.

¶ 4　　Ten months after the juvenile court adopted mother's treatment plan, the Department moved to terminate her parental rights.  Though mother had been representing herself, she requested court-appointed counsel, which the court granted.  At the Department's recommendation, the court also appointed a guardian ad litem (GAL) for mother.

¶ 5　　Within a month of those appointments, mother's counsel filed a notice asserting that the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213, applied to mother.  The notice asserted that mother had "an undiagnosed substance use disorder and other undiagnosed mental health issues" but did not request any specific accommodations; rather, it said that her counsel would confer with the other professionals "should [mother] require any accommodations or modifications."  Mother's counsel then moved to continue the termination hearing because the "professional team

need[ed] to determine what accommodations [were] necessary" for mother. The court granted the continuance, noting that although mother had not completed a psychological evaluation as required by the treatment plan, her therapist had recommended a neuropsychological evaluation, which was already scheduled.

¶ 6 Mother completed the neuropsychological evaluation in June 2023. However, the evaluation didn't yield a diagnosis or any treatment recommendations. Mother's counsel then moved to continue the termination hearing again so mother could participate in a second neuropsychological evaluation. The court granted the second continuance, and mother completed the second evaluation in October 2023. Thereafter, mother's counsel filed a notice of requested accommodations, which were based on the psychologist's recommendations.

¶ 7 The juvenile court then held a three-day contested termination hearing. Over two-and-a-half years after the filing of the petition, the court terminated mother's parental rights.

## II. Statutory Criteria and Standard of Review

¶ 8      The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent hasn't complied with an appropriate, court-approved treatment plan or the plan hasn't been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2024.

¶ 9      The question of whether a juvenile court properly terminated parental rights is a mixed question of fact and law. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10; *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. Thus, we review the court's factual findings for clear error but review de novo its legal conclusions based on those facts. *S.R.N.J-S.*, ¶ 10; *A.S.L.*, ¶ 8.

## III. ADA Accommodations

¶ 10      Mother contends that the juvenile court erred by finding that her treatment plan was appropriate and that the Department made reasonable efforts to rehabilitate her because the Department failed to provide reasonable accommodations for her disability. We aren't persuaded.

## A. Applicable Law

¶ 11    The ADA requires the juvenile court and the department of human services to account for and, if possible, make reasonable accommodations for a parent's disability when devising a treatment plan and providing rehabilitative services. *People in Interest of S.K.,* 2019 COA 36, ¶ 34.  But the ADA doesn't restrict the juvenile court's authority to terminate parental rights if a parent, even due to a disability, isn't able to meet a child's needs. *People in Interest of C.Z.,* 2015 COA 87, ¶ 17.  Rather, before terminating parental rights under section 19-3-604(1)(c), the ADA requires the juvenile court to consider whether reasonable accommodations were provided when determining the appropriateness of a parent's treatment plan and whether the department made reasonable efforts to rehabilitate the parent. *S.K.,* ¶ 34.

¶ 12    Whether a parent is a qualified individual with a disability under the ADA requires a case-by-case determination. *Id.* at ¶ 21. Before a department can be required to provide reasonable accommodations under the ADA, it must know that the individual has a qualifying disability, either because that disability is obvious

5

or because someone has informed the department of the disability. *Id.* at ¶ 22. Thus, while a department must provide appropriate screening and assessments of a parent, the parent is responsible for disclosing information regarding her disability. *Id.* at ¶ 21. And a parent should also identify any modifications that she believes are necessary to accommodate her disability. *Id.*

¶ 13 In considering whether reasonable accommodations can be made for a parent's disability, the juvenile court's paramount concern must always be the child's health and safety. *Id.* at ¶ 36. Thus, what qualifies as a reasonable accommodation will vary from case to case based on the child's needs, the nature of the parent's disability, and the available resources. *Id.* at ¶ 39.

### B. Analysis

¶ 14 We first reject mother's argument that the juvenile court "ignore[d] the ADA and mother's protected disability," as evidenced by the lack of ADA findings in its termination judgment. Though the court didn't specifically find that the ADA applied or conclude that the Department provided reasonable accommodations for mother's disability, it acknowledged that mother had filed a notice

6

of ADA applicability.  It then found that the Department "engaged in significant efforts to assist . . . mother in getting psychological evaluations done and seeking the necessary treatment."  It also found that after the psychological evaluation was completed, the Department "implemented [the] recommendations for accommodation[s] suggested by [the psychologist]."

¶ 15     Mother doesn't dispute these findings.  Rather, she argues that even before she had completed her psychological evaluation, the Department should have provided reasonable accommodations because it was "on notice" of her "obvious" disability throughout the case.

¶ 16     It is true that the caseworker reported significant concerns about mother's confusion, delusional thinking, and erratic behavior as early as August 2022.  But we disagree with mother that those concerns amounted to knowledge of an "obvious" qualifying disability under the ADA because mother's symptoms, on their own, didn't establish that mother had a "physical or mental impairment that substantially limit[ed] one or more major life activities."  *See* 42 U.S.C. § 12102(1)(A).  Instead, as noted by the juvenile court,

mother's concerning behavior made it "very clear" that a psychological evaluation was a "key component" of mother's treatment plan because it would "help determine the basis for her behavior and how she [could] be treated."

¶ 17    In other words, while it was obvious that mother had concerning symptoms, an evaluation was necessary to determine whether those symptoms stemmed from a qualifying disability under the ADA, and, if so, what accommodations were required. *See S.K.*, ¶¶ 21-22.  Indeed, the caseworker testified that the Department couldn't appropriately identify the necessary accommodations to address mother's mental health issues until she completed a psychological evaluation.

¶ 18    To that end, the record shows that the Department made repeated attempts to provide psychological evaluations to determine if mother needed accommodations for a disability.  The Department scheduled a psychological evaluation for mother in April 2022, but she didn't attend.  A few months later, as the Department expressed increasing concerns about mother's mental health, the court advised mother of the importance of completing a psychological

evaluation, and the Department scheduled another one. Although mother went to that appointment, she didn't complete the scheduled intake and decided to reschedule it for the end of September 2022. She didn't attend that appointment, nor did she reschedule it.

¶ 19 Thereafter, the Department recommended that the court appoint a GAL for mother. The court did so and specifically directed mother's GAL to "talk to [mother] about . . . this psychological evaluation" because it was "crucial" for the court to understand what was "going on in [mother's] head."

¶ 20 The Department then arranged a neuropsychological evaluation, and mother completed it. But the professionals agreed that the evaluation wasn't helpful because it didn't provide any insight into mother's mental health. The psychologist didn't "feel comfortable assigning a diagnosis because [mother] denied any current psychological symptoms." At that point, the court granted mother's request to continue the termination hearing, partly because the neuropsychological evaluation was inconclusive, and therefore the court didn't have "potentially critical information"

about whether the ADA applied and whether reasonable accommodations had been provided.

¶ 21 The Department arranged a second neuropsychological evaluation, which mother completed in October 2023. The psychologist diagnosed mother with unspecified schizophrenia spectrum or other psychotic disorder and made specific treatment recommendations. The psychologist testified that after she completed mother's evaluation, the Department contacted her and asked her to attend a meeting to discuss whether "further accommodations" were necessary. And the caseworker testified that the Department provided every accommodation the psychologist recommended.

¶ 22 We acknowledge that in April 2023, mother requested that the court appoint an additional professional to help her understand the importance of the psychological evaluation and require the Department to arrange a medication evaluation for her. But by that time, the court had already appointed a GAL to help her understand the proceedings. And the GAL confirmed that "part of [her] role" was to explain to mother why the psychological evaluation was

necessary. Further, instead of determining whether mother's request for the medication evaluation was reasonable or necessary, the court reiterated that the completion of a psychological evaluation was "critical" to determine what "special accommodations" mother needed. In other words, the request for the accommodation was premature. Indeed, after mother completed the neuropsychological evaluation, the Department arranged a medication evaluation with a psychiatrist at the psychologist's recommendation.

¶ 23    Last, we aren't persuaded that mother's treatment plan was inappropriate because it "did not address the root-cause of mother's issues and did not include any [ADA] accommodations." The appropriateness of a treatment plan — as distinct from the reasonableness of the efforts to implement that plan — must be assessed in light of the facts existing at the time of the plan's approval. *People in Interest of A.N-B.*, 2019 COA 46, ¶¶ 25-26. When the court adopted mother's treatment plan, the Department had reported concerns about substance abuse and domestic

violence, and the treatment plan included goals related to both of those concerns.

¶ 24    Additionally, mother doesn't explain what she means by "root-cause" of her issues. But assuming she means her mental health, the treatment plan addressed that as well. It specifically required her to engage in individual therapy and complete a psychological evaluation. And at the time the court adopted the treatment plan, mother had not raised the ADA, nor had she requested any accommodations. *See People in Interest of S.Z.S.*, 2022 COA 133, ¶ 16 (if a parent knows or has reason to know she has an ADA-cognizable disability, the issue should be raised before the court adopts a treatment plan so the department can include requested accommodations in the treatment plan and provide services accommodating the disability throughout the case).

¶ 25    Moreover, while mother argues that the treatment plan should have been modified to include the psychologist's recommended accommodations, she didn't move the juvenile court to make such modifications; instead, she simply filed a notice of those accommodations. And mother doesn't dispute that the Department

12

provided them.  Thus, it is unclear how adding the accommodations to her treatment plan would have affected the outcome of her case. Accordingly, any error in failing to modify mother's treatment plan was harmless.  *See* C.A.R. 35(c) (we may disregard any error not affecting the party's substantial rights); *People in Interest of R.J.*, 2019 COA 109, ¶ 22 (an error affects a substantial right if it can be said with fair assurance that it substantially influenced the case's outcome or impaired the basic fairness of the proceeding).

¶ 26     In sum, the record shows that throughout the case, the Department made significant efforts to identify mother's disability and determine whether accommodations were necessary.  Once the Department had that information, the record shows that it reasonably accommodated for mother's disability.  Thus, in relation to the ADA, we discern no error in the court's findings that mother's treatment plan was appropriate and that the Department made reasonable efforts to rehabilitate her and reunite her with the child.

## IV. Fit within a Reasonable Time

¶ 27    Mother also contends that the juvenile court erred by finding that she couldn't become fit within a reasonable time. We aren't persuaded.

### A. Applicable Law

¶ 28    A parent is unfit if she is unable or unwilling to give a child reasonable parental care. *S.Z.S.*, ¶ 23. "Reasonable parental care requires, at a minimum, that the parent provide nurturing and protection adequate to meet the child's physical, emotional, and mental health needs." *S.R.N.J-S.*, ¶ 9. A parent's noncompliance with a treatment plan generally "demonstrates a lack of commitment to meeting the child's needs and, therefore, may also be considered in determining unfitness." *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008).

¶ 29    A parent must have a reasonable amount of time to work on a treatment plan before the juvenile court terminates her parental rights. *People in Interest of D.Y.*, 176 P.3d 874, 876 (Colo. App. 2007). The determination of a reasonable period is necessarily fact specific, and, thus, what constitutes a reasonable time to comply with a treatment plan may vary from case to case. *Id.* In

14

determining whether a parent can become fit within a reasonable time, the juvenile court may consider whether any change has occurred during the pendency of the proceeding. *K.D. v. People*, 139 P.3d 695, 700 (Colo. 2006). A reasonable time isn't an indefinite time, and it must be determined by considering the child's physical, mental, and emotional conditions and needs. *S.Z.S.*, ¶ 24.

## B.  Analysis

¶ 30     The juvenile court considered whether mother could become fit within a reasonable amount of time but ultimately concluded that she couldn't. The court noted that mother's treatment plan had been in effect for over two years but found that she was "uncooperative with the evaluation process until recently" and that her condition "ha[d] not significantly improved even following her compliance with psychological evaluations and the introduction of medication." The court also found that mother's "late effort" and "refusal to timely address [her] mental health issues" by obtaining a diagnosis and treatment recommendations "interfered with her ability to . . . repair her relationship with [the child" or provide for

15

his needs. The court concluded that the child had been "waiting for permanency and deserve[d] permanency" and that mother had been given a reasonable amount of time to comply with her treatment plan.

¶ 31 The record supports these findings. By the time of termination hearing, approximately twenty-six months had passed since the court adopted mother's amended treatment plan, yet she hadn't successfully resolved the concerns that gave rise to the case. The caseworker testified that although mother had completed a substance abuse evaluation, she hadn't followed through with any of the recommended treatment. While she had also completed a mental health evaluation, mother had attended only one therapy session. Further, she didn't participate in life skills classes or develop a list of potential caretakers who could fill in for her if she was under the influence. And although mother had completed her neuropsychological evaluation and started taking medication, the caseworker noted that there had been no improvement in mother's thinking.

¶ 32     The caseworker, as an expert in child protection, opined that mother couldn't safely parent the child because she hadn't made "adequate improvement" on the problems that existed at the beginning of the case and wasn't in a "mental health space" that would allow her to provide the consistency and stability the child needed. She also opined that "a reasonable amount of time ha[d] already gone" because the child had been waiting for permanency for over two-and-a-half years. Indeed, as noted by the child's GAL, the child had "been in out-of-home care for 793 [days]."

¶ 33     Next, the child's therapist, who was qualified as an expert in therapeutic evaluation and treatment of children, testified that throughout the case, particularly in the "handful of months" leading up to termination hearing, the child's attachment to mother had gotten worse. The therapist also opined that, while she didn't know how long it might take for mother to be able to safely parent the child, it wasn't in the child's best interests to keep the case open to allow mother more time to work on her treatment plan. In her view, the child had waited a reasonable amount of time for mother to be

in a place to parent him and waiting longer or "spending another day living in this ambivalence" wasn't going to help him.

¶ 34    We reject mother's argument that the juvenile court should have allowed more time, given that she had only recently been diagnosed with schizophrenia and started taking medication. True, mother's individual therapist and her retained expert witness both testified that she hadn't been taking her medication long enough to experience its full effects, that she had recently made progress with her mental health problems, and that it was possible for her to become fit within a reasonable time. But the record indicates that the delay in mother's medication evaluation was due largely to her refusal to complete a psychological evaluation. Moreover, the court — as the finder of fact — heard testimony about mother's recent medication and treatment progress but ultimately determined that it wouldn't be in the child's best interests to allow additional time. *See People in Interest of A.J.L.*, 243 P.3d 244, 252 (Colo. 2010) (attributing more weight to more recent evidence may be appropriate in some instances, but doing so is within a juvenile court's discretion). And we don't reweigh the evidence or substitute

18

our judgment for that of the juvenile court. *People in Interest of K.L.W.*, 2021 COA 56, ¶ 62.

¶ 35 Based on the foregoing, we conclude that the juvenile court properly analyzed whether mother could become fit within a reasonable time. And because the court's findings are supported by the record, we decline to disturb its determination.

## V. Less Drastic Alternatives

¶ 36 Last, mother contends that the juvenile court erred by determining that there were no less drastic alternatives to termination. Specifically, she argues that the court incorrectly concluded that it couldn't allocate parental responsibilities to paternal grandmother over her objection. We disagree.

## A. Applicable Law

¶ 37 The consideration and elimination of less drastic alternatives are implicit in the statutory criteria for termination. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 40. In considering less drastic alternatives, a juvenile court must give primary consideration to the child's physical, mental, and emotional conditions and needs. *People in Interest of Z.M.*, 2020 COA 3M, ¶ 29. A juvenile court may also consider, among other things, (1)

19

whether an ongoing relationship with a parent would be beneficial to the child, which is influenced by a parent's fitness to care for the child's needs, *see People in* Interest *of A.R.*, 2012 COA 195M, ¶ 38; (2) whether the child is bonded with the parent, *see People in Interest of N.D.V.*, 224 P.3d 410, 421 (Colo. App. 2009); (3) whether an allocation of parental responsibilities (APR) provides adequate permanence and meets the child's needs, *see A.R.*, ¶ 41; and (4) whether the placement provider favors adoption over an APR, *see Z.M.*, ¶ 31.

¶ 38    For a less drastic alternative to be viable, it must do more than adequately meet the child's needs; it must be in the child's best interests.  *A.M.*, ¶ 27.  Long-term or permanent placement with a family member, short of termination, may not be in the child's best interests if it wouldn't provide the permanence that adoption would provide or otherwise meet the child's needs.  *A.R.*, ¶ 41.  If a juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the alternative and order termination.  *A.M.*, ¶ 32.

¶ 39    Initially, we reject mother's argument that the juvenile court erred by concluding that it couldn't enter an APR to paternal grandmother over her objection. To the contrary, a division of this court has held that a court can't enter an APR to an unwilling party who isn't the child's parent. *See People in Interest of P.D.*, 580 P.2d 836, 838 (Colo. App. 1978). Mother suggests that we should disregard this precedent because it is forty-six-years old and because it is distinguishable from a case like this one, in which a non-parent has intervened and showed a willingness to care for the child. But she hasn't provided any legal authority to support her assertion that the reasoning in *P.D.* is inapplicable to this case.

¶ 40    In any event, the juvenile court didn't reject an APR solely because of grandmother's unwillingness to accept it. True, the court considered grandmother's preference and found that she was unwilling to accept an APR. *See Z.M.*, ¶ 31. But it also considered whether an ongoing relationship with mother would benefit the child, whether the child was bonded to mother, and whether an APR could provide adequate permanency based on the child's

21

needs. *See A.R.*, ¶¶ 38, 41; *N.D.V.*, 224 P.3d at 421. Specifically, the court found that child's attachment to mother was "going in the wrong direction." The court noted that the child had been diagnosed with post-traumatic stress disorder and anxiety and found that mother couldn't provide the stability and certainty the child needed. The court reiterated that the child had been waiting for permanency for over two-and-a-half years and concluded that termination was in his best interests.

¶ 41 The record supports these findings. Contrary to mother's assertions, paternal grandmother testified that she understood the different permanency options because she had discussed them with the child's GAL, the county attorney, and another attorney. Even so, she testified that she wasn't willing to accept an APR because she didn't believe it would be good for the child's mental health or in his best interests. Specifically, she didn't believe an APR would work because it wouldn't give the child the security of knowing where he would live from year to year.

¶ 42 Next, the child's therapist testified that she couldn't "characterize [mother] and [the child] as having an excellent bond"

22

and that the child's attachment to mother was getting worse. She said that the child had post-traumatic stress disorder and generalized anxiety, which made his need for predictability and consistency greater than the norm. And she opined that mother couldn't meet the child's emotional or mental health needs. The therapist also opined that termination and adoption, not an APR, was in the child's best interests because an APR couldn't ensure permanency or the "feeling of my life can't be ripped out from underneath me at any given time." She believed that the "most ideal" option for the child was to have some contact with mother without her being able to dictate his future.

¶ 43    Finally, the caseworker opined that an APR wouldn't be in the child's best interests because the child needed consistency and stability, which wouldn't be provided through an APR. She went on to opine that even if a caretaker was willing to accept an APR, it would "not [be] appropriate in this case because [the child] need[ed] to have absolute surety" of where his home would be.

¶ 44    Accordingly, because the record supports the juvenile court's finding that termination, not an APR, was in the child's best

23

interests, we don't see any basis for reversal. *See People in Interest of B.H.*, 2021 CO 39, ¶ 80 (when a juvenile court considers less drastic alternatives but instead finds that termination is in the child's best interests, we are bound to affirm the decision so long as the record supports its findings).

## VI. Disposition

¶ 45 The judgment is affirmed.

JUDGE BROWN and JUDGE YUN concur.